### In re Bruce BARR and Paula Barr, Debtors.

### Keith REZIN and Sue Rezin, Plaintiffs,

v.

### Bruce BARR and Paula Barr, Defendants.

**Bankruptcy Nos. 93 B 05857, 93 A 01069.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

April 3, 1996.

Donald V. O'Brien, O'Brien O'Rourke Hogan & McNulty, Chicago, IL, Thomas M. Hartwell, Juergensmeyer Strain & Associates, Elgin, IL, for Plaintiffs.

David G. Lynch, Rudnick & Wolfe, Chicago, IL, for Defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING TRIAL ON COUNT II

JACK B. SCHMETTERER, Bankruptcy Judge.

This Adversary proceeding relates to the joint bankruptcy case filed by Bruce Barr and Paula Barr (collectively "Debtors" or the "Barrs"), under Chapter 7 of the Bankruptcy Code, 11 U.S.C. § 101 et seq.

The plaintiffs, Dr. Keith Rezin and Sue Rezin (collectively "Plaintiffs" or "the Rezins"), allege that they hold unsecured claims totaling $150,000 against Debtors based upon pre-petition state court litigation between the parties. The Rezins obtained an arbitration award against the Barrs for $78,920.17 and anticipate obtaining judgment for $150,000 if the litigation is resumed. To preserve that claim, Plaintiffs filed this two-count Adversary complaint. Under circumstances described in an earlier opinion, Count I was dismissed and not reinstated. *See Rezin v. Barr (In re Barr)*, 183 B.R. 531 (Bankr. N.D.Ill.1995). Only Count II was reinstated following the dismissal.

Count II seeks to have Plaintiffs' claims found nondischargeable under 11 U.S.C. § 523(a)(2)(A), § 523(a)(2)(B), and § 523(a)(6).

At the close of evidence presented by Plaintiffs, Defendants moved for judgment in their favor under Fed.R.Civ.P. 52(c) (Fed. R.Bankr.P. 7052). Pursuant to a separate order, that motion was granted as to Mrs. Paula Barr and as to Plaintiffs' § 523(a)(2)(B) and § 523(a)(6) claims against both Defendants. The instant Findings and Conclusions form the basis for that order. Ruling on whether Bruce Barr's debt should be excepted from discharge under § 523(a)(2)(A) was reserved until the end of trial.

Following trial on Count II, the Court now makes and enters the following Findings of Fact and Conclusions of Law. For reasons stated below, and pursuant to a separate judgment order, the Rezins' claim against the Debtors is found to be entirely dischargeable.

### FINDINGS OF FACT

Dr. Keith Rezin and Susan Rezin are husband and wife who have resided with their children at 3910 Sawmill Lane, Morris, in Grundy County, Illinois (the "Property"), since July 31, 1991. In May, 1991, they purchased the Property from Bruce and Paula Barr while the Property was under construction. When the parties first met, Bruce Barr was performing and supervising construction work to build the residence on Sawmill Lane. He was then engaged in the home construction business with Paula, he to supervise construction and she to handle some business aspects. They had constructed and sold several residences in the area before this one.

At the same time that the Rezins became interested in the Property, Dr. Rezin had accepted an offer from the Morris General Hospital to head its Orthopedic Department and affiliated clinic effective August 1, 1991. Thus, in February of 1991, the Rezins were looking to purchase a home in the Morris area and were directed to the Barrs by a mutual acquaintance who knew that Bruce Barr was building a residence for his own family. On March 2, 1991, the Rezins asked the Barrs to deviate from their plans, sell them the house, and customize it to the Rezins' liking. The Barrs agreed. The parties entered into a contract wherein they agreed to close the sale of the property on July 21, 1991, and any construction work was to be completed by August 1, 1991. These dates were desired by the Rezins because of their need to time their move-in with the start of Dr. Rezin's new position.

During all times mentioned here, Bruce Barr was also the manager of a school bus

company and had a variety of interests other than home building, including the operation of one or more cab companies and livery services. At the time of the Chapter 7 petition, Paula Barr was employed by an interior design company in Morris; the business of constructing residences was not a large part of her daily life.

The Rezins viewed other homes built and completed earlier by Bruce Barr, including one in the same area, and liked what they saw. It was following their view of these houses that they signed the contract for purchase of the Property (the "Sales Contract") on May 22, 1991. The Barrs signed the contract on May 28, 1991, and received $5,000 from the Rezins, with a balance of $230,000 agreed to be paid at the closing. The Rezins and Barrs also signed a contemporaneous Construction Agreement whereby the Debtors agreed to build the house according to certain specifications.

When the two agreements were signed, Bruce Barr had already completed a major portion of work on the Property, having been issued a construction permit by Grundy County Building and Zoning Department. The permit application described Bruce Barr as the owner, resident, and contractor of the property. Subsequent to executing the contract for sale to the Rezins and until the temporary Certificate of Occupancy (described below) was applied for, the Barrs did not disclose to the Building and Zoning Department that the house was being constructed by them for sale to another party.

Bruce Barr is not a licensed electrician, plumber, or roofer. Grundy County permits an unlicensed builder to construct a house for his or her own personal residence. However, a builder must be licensed if performing contracted work for a house to be built for another individual. This requirement is waived under the county ordinance if the builder is constructing the house for himself and lives in the house for six months before selling it. Bruce Barr had built five homes prior to building the Rezin property. He and Paula lived in two of those other homes before selling them. He was generally following the same course of action when the Rezins approached him to sell to them.

Bruce Barr generally used the same subcontractors to build the property being sold to the Rezins that he had used for building other homes. He never represented to the Rezins that he was a licensed contractor; or that he was a licensed electrician, plumber, or roofer; or that he was a professional builder; but he did tell the Rezins that he was a builder of "custom" homes.

During the summer of 1991, Bruce Barr continued working on the property, with help from persons he employed or contracted with. During this time, one of the Rezins was informed by Bruce Barr and Steve Kundert (a person who installed the plumbing but who was not a licensed plumber) that they were going to install plastic tubing instead of the copper plumbing called for in the specifications. The Rezins offered no objection to that change. This cost-cutting method was only an omen of many other cost-cutting methods used by Bruce Barr and which led to the house having many construction defects. Many of those inexpensive construction methods employed were in the end violations of Grundy County building codes.

The July 21, 1991, closing date was post-postponed. On July 28, 1991, agents of the bank funding the Rezins' mortgage had a final walk through of the Property prior to the closing. On July 31, 1991, the Rezins themselves had a final walk throughout the house before closing. At this time it was becoming apparent to them that the Property needed more work to be performed. They detected some of the needs, showed up at the closing with a punch list of items for Mr. Barr to complete or repair, and required an escrow of $7,700 to be established out of the purchase price to ensure completion of those items. Bruce Barr was to be paid out of this account upon completing work on the punch list.

As noted, the Rezins closed the sale of the Property on August 1, 1991. Through their bank loan, they provided Debtors with full payment except for the escrowed amount. Because of that balance due, Bruce Barr promised to complete the items on the punch list and to provide an unrestricted Certificate of Occupancy. Because Keith Rezin was

starting in his new position at the Morris Hospital, the Rezins took possession of the Property on or about the same date. A Grundy County inspector inspected the Property shortly thereafter, apparently learning that the Rezins were to occupy it, but issued only a temporary certificate of occupancy conditioned on performance of certain work. Up to this point, the Rezins had never hired their own architect or engineer to review the plans, specifications, or actual construction, nor a knowledgeable builder or building inspector to advise them.

Bruce Barr repaired some items on the punch list and sought payment from the escrow. Meanwhile, the Rezins were becoming aware that the Property had many construction defects other than those enumerated in the punch list. Shortly after the Rezins moved into the house, they became aware of a myriad of minor and major construction defects not known by them before closing or disclosed to them by the Grundy County inspector. Mrs. Rezin and the children moved out and only Keith Rezin lived on the premises for several weeks. On November 4, 1991, the Rezins offered to rescind the Real Estate Contract. The Barrs did not agree to that. Later that month, the Rezins filed suit against Bruce and Paula Barr in the Thirteenth Judicial Circuit, Grundy County, Illinois, seeking recovery of their asserted damages for multiple contract breaches by the Barrs through defects in construction. In the early fall of 1992, Debtors sought to have the issues resolved before an arbitrator. The Rezins agreed, and the state court appointed an expert builder, Mr. C.W. Lamping, as arbitrator. Mr. Lamping determined that it would cost $78,920.17 to finish the house to contract specifications. By virtue of their agreement, the arbitrator's findings of fact were and remain binding on each party and constitute an adjudication of those fact issues. Moreover, the evidence presented supported all of Mr. Lamping's findings, and from that evidence it is found that to finish the house to contract specifications and correct the defects would indeed require $78,920.17.

The evidence from Mr. Lamping requires a finding that the main support beam which runs across the long expanse of the foundation was assembled by Bruce Barr and an unskilled laborer out of substandard, waterlogged 2 × 12 beams nailed together and improperly placed in a niche chopped out of the foundation. The beam was then supported across the 62 foot length by four wooden posts. The local code requires a laminated Douglas Fir beam as a support beam, and required that this beam be secured at its anchoring points in such a way that it cannot "roll" and lose support. The beam was not properly secured or anchored. Adjustable metal posts are required to support the metal beam from the foundation floor, but the right posts were not used. As a result of the failure of the Barrs to meet those code requirements, within a few days after the Rezins moved in the floors sagged more than two inches, requiring temporary and emergency support for the structurally inadequate beam.

Other structural defects in the supports of ceilings, floors, and walls, as noted in the arbitrator's report, require repairs or rework as he found. For example, there is inadequate support for much of the concrete, including the foundation. It was necessary to replace concrete blocks, and the concrete foundation must be re-excavated and shored up with load-bearing material.

Mr. Lamping also found that the plumbing was installed in violation of applicable codes. The plumbing was installed by Bruce Barr and a friend, both unlicensed plumbers. The state plumbing inspector found many hazardous and potentially hazardous violations. Among the more hazardous aspects of the installation were multiple leaks, the escape of sewer gas, and the intermixing of potable and waste water. Furthermore, instead of installing the copper water service required by the specifications Bruce Barr installed PVC (plastic) pipe. (However, the Rezins had been advised of that change in advance without their objection.)

Electrical work for the house was done by Bruce Barr and his father-in-law, who are not trained in electrical installation. As Mr. Lamping found, the electrical system needs total replacement. Even though the Rezins have attempted to reduce the hazards, most

of that system still needs to be replaced by skilled electricians.

The roof was installed by Bruce Barr and his brother-in-law, neither of whom are roofers. The roof is improperly installed and requires replacement. Some of the cedar trim and freeze boards also need to be replaced. The chimney was left uncapped and, shortly after plaintiffs took possession, rain came through to the first floor of the Property. The fireplace flue is inoperable and no spark arrester was provided.

The heating and air ducts were engineered improperly. Since they do not provide sufficient heat or air, they need to be rebuilt. Furthermore, reinsulation is required since R30 insulation is required for the most part throughout the structure and only R13 to R20 insulation was used.

As of the end of trial, the Grundy County Building and Zoning Department had not ordered the Rezins to vacate the home, but will not issue a permanent Certificate of Occupancy until the work described in the arbitrator's report is completed and has been inspected.

Debtors refused to be bound by Mr. Lamping's report, issued in December of 1992. The Rezins moved in state court for entry of judgment on the arbitration award. The Grundy County Court set a date for hearing on that motion and remaining issues. A few days before that hearing, Debtors filed for Chapter 7 bankruptcy protection. This case followed.

Facts set forth in the Conclusions of Law comprise additional Findings of Fact.

## CONCLUSIONS OF LAW

### Jurisdiction

■ Jurisdiction over this matter lies under 28 U.S.C. § 1334(b) as a matter arising under § 523(a) of the Bankruptcy Code. This Adversary case is a core proceeding under 28 U.S.C. § 157(b)(2)(I) since it relates to the dischargeability of debts. The matters in issue were referred here pursuant to Local Rule 2.33 of the United States District Court for the Northern District of Illinois which automatically refers all bankruptcy cases and related proceedings to bankruptcy judges in this District for hearing.

### Standards

■ The party seeking to establish an exception to discharge of debt bears the burden of proof, *First Federated Life Ins. Co. v. Martin (In re Martin)*, 698 F.2d 883, 887 (7th Cir.1983), to be met by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). To further the policy of providing a debtor with a fresh start in bankruptcy, exceptions to discharge are construed strictly against the creditor and liberally in favor of the debtor. *Mayer v. Spanel Intern'l Ltd.*, 51 F.3d 670, 674 (7th Cir.1995), *cert. denied*, — U.S. ——, 116 S.Ct. 563, 133 L.Ed.2d 488 (1995); *Meyer v. Rigdon*, 36 F.3d at 1375, 1385 (7th Cir.1994); *Goldberg v. Scarlata*, 979 F.2d 521 (7th Cir.1992). Discharge is an essential feature to this notion of a "fresh start" in bankruptcy. *In the Matter of Marchiando*, 13 F.3d 1111, 1115 (7th Cir.1994), *cert. denied*, — U.S. ——, 114 S.Ct. 2675, 129 L.Ed.2d 810 (1994).

### Standard for Judgment on Partial Findings

■ Federal Rule of Civil Procedure 52(c), made applicable to bankruptcy proceedings by Fed.R.Bankr.P. 7052, permits judgment to be entered as a matter of law at any time that a court can appropriately make a dispositive finding. If a party has been heard fully on an issue and failed to sustain its burden of proof on that issue, the court may find against that party on that issue. If the issue is necessary to the maintenance of the cause of action, judgment may be entered against that party. In making this determination, evidence should be weighed and any conflicts in the record should be decided according to applicable standards. *Sanders v. General Serv. Admin.*, 707 F.2d 969, 971 (7th Cir.1983). If a defendant's motion for judgment is denied on partial findings and a judgment is reserved until the close of all of the evidence, presentation of the case will continue. As the trial court, the bankruptcy judge has discretion to decline to render a judgment until all of the evidence has been

heard. *Internat'l Union of Operating Engineers, Local Union 103 v. Indiana Construction Corp.,* 13 F.3d 253 (7th Cir.1994).

■ Since Mrs. Barr was not shown to have involved herself in construction operations, or to have held herself out in any way as skilled in such work, or to have made any representations other than may be gleaned from the contract papers, the case against her was clearly without merit at the close of Plaintiffs' proof under standards discussed herein. However, ruling on Defendants' § 7052 Motion was reserved as to Mr. Barr.

### *Section 523(a)(2)(A)*

Section 523(a)(2)(A) provides in relevant part:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

■ In order to except their claims against the Barrs from dischargeability under § 523(a)(2)(A), the Rezins must establish that (1) the Barrs obtained the funds at issue from the Rezins through fraud or through false pretenses or representations they either knew to be false, or that they had such reckless disregard for the truth as to make the representations constitute willful misrepresentations; (2) the Barrs possessed the requisite scienter, i.e., they actually intended to deceive the Rezins; and (3) to their detriment, the Rezins justifiably relied on the misrepresentations. *See Field v. Mans,* — U.S. —, —, 116 S.Ct. 437, 443–44, 133 L.Ed.2d 351 (Nov. 28, 1995); *see also Mayer v. Spanel Int'l Ltd. (In re Mayer),* 51 F.3d 670, 673 (7th Cir.1995), *cert. denied,* — U.S. —, 116 S.Ct. 563, 133 L.Ed.2d 488 (Dec. 4, 1995).

Section 523(a)(2)(A) lists three separate grounds for dischargeability: actual fraud, false pretenses, and false representation. However, the Seventh Circuit applies a single test to actions alleging actual fraud, false representation, and false pretenses, even though the elements of each were different under common law. *See Mayer v. Spanel Internat'l Ltd.,* 51 F.3d 670, 674 (7th Cir. 1995), *cert denied,* — U.S. —, 116 S.Ct. 563, 133 L.Ed.2d 488 (Dec. 4, 1995); *see also Banner Oil Co v. Bryson (In re Bryson),* 187 B.R. 939 (Bankr.N.D.Ill.1995).

### *Express Misrepresentations not Proved*

The Rezins claim that Bruce Barr made at least three specific "misrepresentations:" (1) that he stated in the Sales Contract that he would build the house in a good and workmanlike manner, which in the end he certainly did not; (2) that he verbally misrepresented the fact that he was a "custom" builder who could properly build their home; and (3) that he promised to obtain a permanent Certificate of Occupancy shortly after the closing, knowing that was impossible to accomplish, and thereby tricked the Rezins into closing.

However, in light of evidence presented, none of the statements relied on comprised a misrepresentation under § 523(a)(2)(A). The Rezins failed to demonstrate by a preponderance of evidence that Bruce Barr either induced them to enter the Sale Contract, or to enter into the closing, through representations he either knew to be false or made with such reckless disregard for the truth as to constitute willful misrepresentation.

■ At the time of closing, the Property was rife with construction defects. Many have been described above. Most notably, the electrical system, plumbing, and much of the structural support were faulty. However, language in a sales contract stating that a contractor will build a home in good and workmanlike manner according to specifications does not amount to a misrepresentation merely because the contractor breaches that promise.

■ Failure to fulfill a contractual obligation by itself does not establish a misrepresentation for purposes of § 523(a)(2)(A). 3 Collier on Bankruptcy ¶ 523.08 at 523–54 (15th Ed.1994); *Keeling v. Roeder (In re Roeder),* 61 B.R. 179 (Bankr.W.D.Ky.1986);

*Garza v. Baker (In re Baker),* 139 B.R. 692, 694 (Bankr.N.D.Ohio 1992). Aptly pointing out that a breach of contract is not necessarily a misrepresentation for purposes of § 523(a)(2)(A), the court in *Leeb v. Guy (In re Guy),* 101 B.R. 961, 978 (Bankr.N.D.Ind. 1988) stated that

> [subsequent conduct contrary to a former representation does not necessarily render the original representation false. However, if a debtor enters into a contract intending not to comply with its terms and later defaults under that contract, such contract may provide a basis for exceptions to discharge on the grounds of fraud if the other remaining elements are satisfied].

(citations omitted).

As noted below, the Rezins have not established by preponderance of evidence that, when the parties entered into the contract in May of 1992, or when the sale closed, either Mr. or Mrs. Barr intended to take their money while building the property shoddily and in breach of contract or local building code requirements. There was evidence that Bruce Barr had built other custom homes in an apparently acceptable manner, and therefore no pattern of fraud or false representations was shown so as to infer intent. Without proof of intent, mere breach by the Barrs of the Sales Contract and the Construction Agreement does not establish misrepresentation at the time that Bruce Barr entered into the contract.

■ There is quite a difference between a misrepresentation of prior fact and a promise for future performance which is not performed. The former may come under § 523(a)(2)(A), the latter ordinarily may not. The evidence showed that in May of 1991, when both parties entered into the Sales and Contract Construction Agreement, Bruce Barr probably intended to build the home being sold to the Rezins in the same way he had always done, using unskilled and semi-skilled labor and cost-cutting materials and construction techniques. Those techniques seem to have worked out for the prior houses. At least no problems surfaced as to those houses that ever came to the attention of the Rezins, and none were shown by the proof at trial. Thus, the Rezins did not prove by preponderance of the evidence that Bruce Barr's statement that he would build a house in a good and workmanlike manner was a false pretense, false representation, or actual fraud.

■ The Rezins also contend, considering numerous construction defects in their home, that Bruce Barr's claim to be a "custom home builder" was a misrepresentation. However, Bruce Barr representing himself to be a builder of "custom homes" was not a misrepresentation in light of the evidence. He did not represent that he was a licensed or bonded general contractor. Instead, he correctly described himself as a builder of homes custom designed to purchaser requirements. He had done an adequate job in building five other custom homes. Although Bruce Barr proved to be a poor and even careless builder, he did not misrepresent his abilities or experience.

Indeed, the so-called "misrepresentations" asserted and relied on by Plaintiffs to have occurred before they contracted were more marketing hyperbole than anything else, close to what has been called "mere puffing." Certainly the Barrs' contractual representations could be called puffing. *See Alvine v. Keller (In re Keller),* 72 B.R. 599 (Bankr. M.D.Fla.1987) (homeowner could not establish misrepresentation for purposes of § 523(a)(2)(A) since statements by debtor-contractor that corporation enjoyed excellent reputation in community for building homes was merely puffing).

■ The Rezins further contend that Bruce Barr's promise to obtain a permanent Certificate of Occupancy soon after closing induced them to finalize buying the house. They argue that Barr knew he could not obtain that Certificate after the sale and misrepresented his ability to obtain it, given the condition of the house. However, evidence showed that the local building inspector reviewed the premises shortly before the closing and noticed very few and relatively minor defects. He approved a Temporary Certificate of Occupancy and may well have granted a Final Certificate had the kitchen countertops then been in place. More serious defects came to light after the closing

when the floor sagged and a construction expert found the causes. However, it was not proven that Bruce Barr knew before the closing date that his construction techniques would block a Final Certificate. Plaintiffs did not meet their burden to show that Bruce Barr misrepresented his intent or ability to obtain a Final Certificate of Occupancy while knowing that he could never do so.

### No Implied Representations Comprising False Pretenses

The Rezins also claim that the debt should be found non-dischargeable under § 523(a)(2)(A) since Barr implied that he was an experienced general contractor. It is suggested that this might fulfill the requirements of the "false pretenses" prong of § 523(a)(2)(A).

■ A false pretense involves an implied misrepresentation or conduct intended to create and foster an impression. *Scarlata,* 112 B.R. 279 (Bankr.N.D.Ill.1990), *aff'd in part, rev'd in part,* 127 B.R. 1004, 1009 (N.D.Ill.1991); *aff'd in part,* 979 F.2d 521 (7th Cir.1992); *Itaparica, Lt. v. Hargrove (In re Hargrove),* 164 B.R. 768, 772 (Bankr. N.D.Okla.1994). "False pretenses" has also been interpreted to mean:

> [A] series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor ... A false pretense is usually, but not always, the product of multiple events, acts or representations undertaken by a debtor which purposely create a contrived and misleading understanding of a transaction that, in turn, wrongfully induces the creditor to extend credit to the debtor. A "false pretense" is established or fostered willfully, knowingly and by design; it is not the result of inadvertence.

*P & S X–Ray Company, Inc. v. Dawes (In re Dawes),* 189 B.R. 714 (Bankr.N.D.Ill.1996), *quoting Evans v. Dunston (In re Dunston),* 117 B.R. 632 (Bankr.D.Colo.1990), *aff'd in part, rev'd in part,* 146 B.R. 269 (D.Colo. 1992).

■ The Rezins claim that when Bruce Barr tendered the house and promised to obtain a Certificate of Occupancy within several days, he impliedly warranted that he had built the house in workmanlike manner. This implied warranty is argued to be a misrepresentation as a matter of law since Bruce Barr knowingly did not use licensed workers for the building of the house. For instance, Mr. Barr put up the structural beam without help of a structural engineer or architect. Furthermore, Bruce Barr subcontracted with a water softener installer, not a licensed plumber, to install the plumbing. The Rezins charge that such actions are *per se* not "workmanlike" and give rise to a misrepresentation.

To show an implied misrepresentation under this theory, the Rezins had to prove by preponderance of the evidence that Bruce Barr understood that the work done was improper or that he was reckless in discovering whether the work was done properly. The weight of evidence did not establish such prior understanding or reckless disregard for the truth. Bruce Barr had built other homes, but this time he failed miserably. There was no evidence that he intended to build a bad house or that he knowingly did so, nor was there evidence that he did anything different in building this house. It was not shown, for example, that he intended to put up the beam poorly or knew he lacked ability to install it correctly. Nor was it proved that he knew that his work on the beam was defective at the time the sale was closed. His failure to install such beam properly in this case was a botched job, but not a misrepresentation, implied or otherwise. More is needed to except construction defects from discharge under § 523(a)(2)(A). Otherwise, any debt arising out of a house sold with a serious construction defect would be non-dischargeable under that provision, and that is clearly not the way the statute is written or intended. Selling of the Property with knowledge that the beam was installed improperly, and with an intent to deceive, could in this case have constituted an implied misrepresentation at time of closing, but such knowledge and intent was not established.

The Rezins argue that Bruce Barr knowingly concealed various defects from them and so engaged in an implied misrepresentation and a false pretense. Since the Rezins say they were not able to detect these defects when they reviewed the Property prior to closing, they assert misrepresentation. It is clear that Plaintiffs failed to detect the defects even though they were in plain view because the Rezins were inexperienced in construction matters.

This argument proves too much. If the Rezins could claim to be victims of misrepresentation because they could not recognize defects due to their inexperience and lack of understanding of what they saw, then any defect in home construction would be a misrepresentation when observed by novices. The Rezins did not hire their own professional to review the work during construction or immediately prior to the closing. Because they were not able to recognize defects which they saw does not mean that such defects were concealed so as to make them implied misrepresentations or acts of fraud. An experienced professional could have easily detected the defects, as one did when called in to inspect after the closing. There has been no evidence that Bruce Barr ever attempted to hide any of the bad workmanship.

### Intent

For Bruce Barr's debt to be nondischargeable under § 523(a)(2)(A), the Rezins must show not only that Mr. Barr induced them to pay for the Property through false representations, pretenses, or fraud, but also that Mr. Barr acted with "scienter." *In the Matter of Sheridan*, 57 F.3d 627 (7th Cir. 1995); *Mayer v. Spanel Internat'l Ltd.*, 51 F.3d at 675. As the Supreme Court held, a debt can be held nondischargeable under § 523(a)(2)(A) only if the Debtor acted with scienter. *Field*, — U.S. at —, 116 S.Ct. at 443. Otherwise, debtors who made "unintentional and wholly immaterial misrepresentations having no effect on a creditor's decision" would always have their debts be found nondischargeable. *Id.*

An intent to deceive may be inferred from a false representation which the debtor knows or should know will induce another to advance money to the debtor. *First National Bank of Red Bud v. Kimzey (In re Kimzey)*, 761 F.2d 421, 423–24 (7th Cir.1985). Fraudulent intent can be established by circumstantial evidence. *Galvin v. Cole (In re Cole)*, 164 B.R. 947, 949 (Bankr. N.D.Ohio 1993).

The Rezins argue that Bruce Barr misrepresented that he would build them a quality home thereby inducing them to buy the Property while never intending to properly build such a house. They contend that, prior to his entry into the Sale Contract and thereafter, Mr. Barr knowingly used inappropriate cost-cutting measures which could only result in a badly built house. The Rezins also contend that Bruce Barr induced them to close on the sale of the house when he knew that the house contained defects other than the ones on the punch list. Furthermore, the Rezins contend that Bruce Barr never intended to procure a permanent Certificate of Occupancy as he promised at the closing, and knew that he could not do so. However, as earlier discussed, Plaintiffs were not able to prove by preponderance of evidence that Bruce Barr possessed the foregoing intent and knowledge necessary to except their judgment from discharge based on these contentions.

Bruce Barr was well on his way in constructing the house in question when he was approached by the Rezins. There is no proof that he then changed his construction techniques. It was not proved that Bruce Barr hid any of the construction defects. He had no history of swindling his five prior customers or selling them lemons as homes. Most significant, the evidence did not establish the assertion that Mr. Barr induced the Rezins to close on the house with knowledge of construction defects not on the punch list, or with knowledge that he could not obtain a permanent Certificate of Occupancy.

The Rezins argue alternatively that, once a skilled contractor or builder represents his skill to a client, that party is estopped from arguing that defects are due to mere failure to do the job through negligence. In other words, they contend that Bruce Barr possessed the requisite intent

required by § 523(a)(2)(A), since persons who represent themselves as skilled in a profession cannot defend their mistakes through an "empty head but good heart defense." For this proposition, the Rezins cite the Restatement of the Law of Torts, § 299A:

> Unless he represents that he has greater or less skill or knowledge, one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities.

This argument fails because of the scienter requirement of § 523(a)(2)(A). Even assuming that Bruce Barr represented himself to be a skilled person as described by § 299A, such a representation does not necessarily or by itself fulfill the scienter requirement of § 523(a)(2)(A). Under the Bankruptcy Code, actual scienter is required to bar dischargeability, even though under the Tort Restatement some degree of skill and knowledge is implied.

### *Justifiable Reliance*

■■■ The United States Supreme Court held recently that the correct standard for measuring reliance for purposes of § 523(a)(2)(A) is "justifiable reliance." *Field v. Mans*, —— U.S. ——, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Thus, *Field* requires, for a debt to be nondischargeable under section 523(a)(2)(A), that creditors must have, in fact, relied on the Debtor's actual representation, and that the creditors' reliance must have been "justifiable." Moreover, as discussed earlier, bankruptcy courts in the Seventh Circuit must apply a single standard in this regard to all proceedings under § 523(a)(2)(A), whether the allegation is fraud, false pretenses, or false representation. *Mayer*, 51 F.3d at 674. Thus, "justifiable reliance" is an element of all § 523(a)(2)(A) actions to be proved by all plaintiffs in § 523(a)(2)(A) proceedings, regardless of the theory of the case. *See Irwin v. O'Bryan*, 190 B.R. 290 (Bankr. E.D.Ky.,1995) (applying *Field*'s justifiable reliance standard to § 523(a)(2)(A) action al-

leging fraudulent misrepresentation); *Stone v. Parriman*, 190 B.R. 88 (Bankr. E.D.Ky.,1995); *Bombardier Capital, Inc. v. Baietti*, 189 B.R. 549 (Bankr.D.Me.1995) (holding that the standard in *Field* applies to all actions under § 523(a)(2)(A)). The policy reason that reliance must be justifiable is "providing some objective corroboration to plaintiff's claim that he did rely." W. Keeton, D. Dobbs, R. Keeton, and D. Owen, *Prosser and Keeton on the Law of Torts*, § 108 at 749–50 (5th Ed.1984); *see also In re Kirsh*, 973 F.2d 1454, 1458 (9th Cir.1992).

In *Field*, the Supreme Court explained the "justifiable" reliance standard. Seeking guidance from tort law, the opinion stated:

> Justification is a matter of the qualities and characteristics of the particular plaintiff and the circumstances of the particular case ... Justifiability is not without some limits, however ... a person is required to use his sense and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation. Restatement (Second) of Torts (1976), comments a, b.

> "It is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own." W. Prosser, Law of Torts § 108 (5th Ed.1984).

*Field v. Mans*, —— U.S. ——, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

■■■ For the sake of this discussion, it can be assumed *arguendo* that, when the Rezins entered into the Sale Contract with the Barrs, they actually relied on Bruce Barr's representations that he was a "custom" home builder, and that he would build their home in workmanlike fashion. Even assuming such representations were specific enough to be actionable here, such reliance by the Rezins was not justified at any time in their relationship.

In February of 1991, the Rezins were introduced to the Barrs by acquaintances who

knew that Bruce Barr built custom homes and was building a home at the time. The Rezins checked some of Bruce's references regarding the quality of his work and everything seemed to be in order.

But—in the words of the Restatement— did they "blindly rely upon a misrepresentation, the falsity of which would be patent . . ." had they used their "opportunity to make a cursory examination or investigation"? Since the Rezins were not knowledgeable in home construction, the minimal "cursory examination or investigation" required of them under the justifiable reliance standard required them to employ a qualified person to review construction of their future home periodically. They were educated and very sophisticated persons who were aware of their lack of knowledge concerning home construction, but they chose not to hire an expert consultant. At the time, the Rezins did not even ask Bruce Barr whether he had a contractor's license. In May, they entered into the Sales Contract and the Construction Agreement. At the time they did not ask questions about who Bruce Barr was going to hire to finish the home, and evidence did not show any misrepresentation as to the skills, training, or licensing of the workers. There was no evidence that they even requested or received a general contractor's affidavit as to subcontractors and trades used.

At the closing date, the Rezins' reliance on what may be considered *arguendo* Bruce Barr's continued representations that he would do (and, they argue, his implied representation that he had done) an adequate job was certainly unjustified. It is unclear why the first closing date was postponed, although there was some testimony that it was postponed because the Rezins and a family member observed some defects and unfinished work. Prior to the second closing date, they noticed many other defects. A punch list was made out. At that time, thus alerted, the Rezins should certainly have employed their own qualified inspector to review the premises before they closed. Such an inspector is routinely hired by many buyers prior to accepting homes, unless they already have their own engineer or architect. Apart from the Rezins and their lender's representative, only a county building inspector looked at the home prior to closing. However, that inspector was not hired by the Barrs, his report only noted very minor defects, and he missed the most serious problems. The Rezins did not justifiably rely on any representations by Barr since they purchased a custom built house without hiring an qualified inspector to examine the house with experienced eyes.

One cannot close his eyes and claim to have "justifiably" relied on some representations following an "inspection" consisting of not seeing anything. And those not knowledgeable in home construction are like blind persons trying to make their own inspections unless they employ their own knowledgeable inspector, engineer, or architect.

### Other Case Authorities Do Not Support Plaintiffs

Several cases have been found or cited in which a homeowner has tried to except a debt from discharge owed to him by the contractor who built or improved his home, where the debt arose out of the contractor-debtor's bad workmanship. *See, e.g., Peterson v. Bozzano (In re Bozzano)*, 173 B.R. 990 (Bankr.M.D.N.C.1994) (debt held nondischargeable where builder intentionally misled purchasers into believing that he was qualified general contractor and purchasers detrimentally relied); *First Baptist Church v. Maurer (In re Maurer)*, 112 B.R. 710 (Bankr.E.D.Pa.1990) (debt found dischargeable where church was not able to prove that debtor never intended to complete work at time that contract for repair of church roof was entered into); *Heeter v. Birt (In re Birt )*, 173 B.R. 346 (Bankr.N.D.Ohio 1994) (debt arising out of check was excepted from discharge on basis of debtor-contractor's fraudulent representation that he needed the check to order windows); *Alvine v. Keller (In re Keller)*, 72 B.R. 599 (Bankr.M.D.Fla. 1987) (homeowner could not establish misrepresentation for purposes of § 523(a)(2)(A) since statements by debtor-contractor that corporation enjoyed excellent reputation in community for building homes was merely puffing); *Taylor v. Kaufmann (In re Kaufmann)*, 57 B.R. 644 (Bankr.E.D.Wis.1986)

(debt held dischargeable since facts did not establish that contractor knew he was incompetent to build addition to home at time of contract); *Seiders v. Fenninger (In re Fenninger),* 49 B.R. 307 (Bankr.E.D.Pa.1985) (debt held non-dischargeable where debtor signed contract to remodel kitchen with actual intent to defraud).

No actual intent to defraud was established here as in *Seiders.* Since the debt in *In re Bozzano,* 173 B.R. 990 (Bankr. M.D.N.C.1994), was found to be non-dischargeable under facts resembling those here, the Rezins rely heavily on that case. In *Bozzano,* the plaintiffs contracted to buy from Bozzano Construction Company a house then under construction. Prior to closing, a punch-list of unfinished work was agreed to. After moving in, the plaintiffs discovered many other defects. Initially, the debtor tried to fix some items on the punch-list and some of the newly discovered defects, but failed in attempts to cure most defects. The plaintiffs sued him, and Mr. Bozzano sought protection under Chapter 7 of the Bankruptcy Code. Evidence showed that Bozzano had promised that house would be completed if the Petersons agreed to purchase it; that it was a quality built house; that the house had extra touches, and that it contained "old world" craftsmanship. *Id.* at 993. As in this case, Bozzano never told the purchasers that he did not have a general contractor's license. The court found the debt non-dischargeable under the "false pretenses" section of § 523(a)(2)(A), finding that "Bozzano was not qualified to be the general contractor for a large residence ..., which was just the opposite of the false impression created by Bozzano that he was qualified to build the house and was doing so competently." *Id.* at 994.

However, the facts in *Bozzano* were different in three significant ways from the instant case. Unlike this case, in *Bozzano* the Debtor actually engaged in fraud when applying for the building permit by falsely claiming that he was a licensed general contractor. Also, unlike this case, the Debtor had never been the general contractor for any other house construction, having only been a carpenter employed by others on other projects.

Furthermore, in *Bozzano,* the debtor was aware that he needed a general contractor's license to build the home, twice tried to obtain such a license, and failed. Despite this knowledge, he did not disclose to the purchasers that he did not possess such a license. The opinion in *Bozzano* noted that debtor's statements to the plaintiffs regarding anticipated quality of the house and the craftsmanship, standing alone, would probably be insufficient to establish nondischargeability. *Id.* at 993. However, the foregoing history, considered together with evidence that the debtor there fraudulently sought to obtain the building permit, had never built a home before, and was trying to get a license he needed but was not qualified for, turned the puffing into "false pretenses." *Id.* at 994.

The facts found critical to the ruling in *Bozzano* are not present here. The Barrs were not required by county ordinance to be a licensed builder in order to build a home for their own use, as intended when the original permit was obtained and construction began. On this basis, construction was well along before the Rezins came on the scene. Thus, the Barrs did not use fraud to obtain their construction permit. Mr. Barr did not need a general contractor license to start construction and did not claim he had one. Also unlike Bozzano, Bruce Barr never committed fraud in an effort to obtain a building license.

Moreover, the Barrs were not engaging in fraud or false pretenses when they told the Rezins they could finish the home for them. Unlike the debtor in *Bozzano,* Bruce Barr had built five homes before and was somewhat experienced. His conduct and motives were not "tainted from the outset" as the court in *Bozzano* found that debtor to be.

### *Section 523(a)(2)(B)*

Section 523(a)(2)(B) provides as follows:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing or credit, to the extent obtained by—

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's . . . financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523(a)(2)(B).

■ To prevail on a complaint under § 523(a)(2)(B), a creditor must prove: (1) that the Debtor made a statement in writing; (2) that the statement was materially false; (3) that the statement concerned the Debtor's or an insider's financial condition; (4) that in making this misrepresentation, the Debtor had an intent to deceive the Creditor; and (5) that the Creditor actually and reasonably relied upon the misrepresentation. *In re Bogstad*, 779 F.2d 370, 372 (7th Cir.1985).

■ The Rezins have not established any written statements made by Bruce Barr regarding his financial condition. The Sale Contract or the Construction Agreements do not qualify as written statements regarding a "Debtor's or insider's financial condition" because they did not deal with Bruce Barr's financial condition. The record does not contain any other written statements that were authored or signed by Bruce Barr or which even remotely could be construed as dealing with his financial condition.

### Section 523(a)(6)

Section 523(a)(6) excepts from discharge any debt incurred by "willful and malicious injury," and provides in pertinent part:

(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C. § 523(a)(6).

■ In order for a debt to be held nondischargeable under § 523(a)(6), plaintiffs must prove that injury resulted from an act that was both willful and malicious. *Dornik v. Maurice (In re Maurice)*, 138 B.R. 890,

896 (Bankr.N.D.Ill.1992), *aff'd* 1992 WL 308535 (N.D.Ill. Oct. 19, 1992), *aff'd*, 21 F.3d 767 (7th Cir.1994) (*quoting Kimzey*, 761 F.2d at 424); *Taradash v. Pokorny (In re Pokorny)*, 143 B.R. 179, 182 (Bankr.N.D.Ill.1992). The term "willful" means deliberate or intentional, and "malicious" means wrongful and without just cause or excuse; it does not require ill will or specific intent to do harm. *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994) (citations omitted); *McCarthy v. McCarthy (In re McCarthy)*, 179 B.R. 876, 880 (Bankr.N.D.Ill.1995).

■ The Rezins allege that Bruce Barr from the outset intended to build the Property carelessly and with defects, and therefore willfully and maliciously injured them. As earlier discussed, the Plaintiffs did not prove that Bruce Barr intended to build the property with the defects herein described, even though evidence showed that he was obviously negligent in building the Property and breached the contract and building code in many ways. Mr. Barr had adequately built five other homes, and it was not proved that this time he expected to build or knew he would build a defective home. Indeed, had Bruce Barr always intended to build the Property in a defective way, he would have hidden or masked the defects. It was not established that he tried to hide the bad workmanship. Neither were the Rezins able to show any maliciousness on Barr's part. Accordingly, grounds were not established under § 523(a)(6).

### CONCLUSION

The Rezins were not able to meet their burden to bar discharge of the debt due to them, for reasons discussed. The debt due to the Rezins based on defects in construction of their home is dischargeable.

The Rezins were victims of most serious incompetency on the part of Mr. Barr, incompetency that is now plain to him as it is now to the Rezins and to this Court. However, this unhappy situation is not enough to except the resulting debt from discharge.