### In the Matter of John E. MAYER and Deborah Mayer, Debtors–Appellants,

### v.

### SPANEL INTERNATIONAL LTD. and Bank One–Rockford, N.A., Creditors–Appellees.

### Nos. 94–1389 & 94–3870.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 14, 1994.

Submitted March 10, 1995 *.

Decided March 31, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied April 24, 1995.

---

* Appeal No. 94–1389 was argued on September 14, 1994. The debtors' later appeal, No. 94–

3870, was submitted to the same panel for decision under Operating Procedure 6(b). The panel deferred disposition of No. 94–1389 until the briefing had been completed in No. 94–3870. The panel is unanimously of the view that oral argument is unnecessary in No. 94–3870, which presents legal issues already explored at the argument of No. 94–1389. We have consolidated the two appeals for disposition in a single opinion.

William Moroney (argued), Law Offices of Lawrence Friedman, Chicago, IL, for Spanel Intern., Ltd.

Kenneth A. Michaels, Jr. (argued), Michaels & Associates, Chicago, IL, for John E. Mayer and Deborah J. Mayer.

Gloria E. Block (submitted), Block & Block, Chicago, IL, Stephen Ellis, Ellis & Ellis, Rockford, IL, for Bank One–Rockford, N.A.

Before LAY,** EASTERBROOK, and RIPPLE, Circuit Judges.

EASTERBROOK, Circuit Judge.

■ Two bankruptcy appeals present a common question: whether a liar may obtain a discharge in bankruptcy by showing that the victim did not do enough to nose out the truth. Debts attributable to fraud may not be discharged, 11 U.S.C. § 523(a)(2)(A), and intentional deceit concerning a material proposition is fraud whether or not a more-alert target would have smelled a rat. Victims of intentional torts need not take special precautions.

The first transaction occurred in December 1987. John and Deborah Mayer jointly borrowed more than $135,000 to purchase the Bess Hotel, a residence for transients in Rockford, Illinois. The Mayers presented financial statements showing assets exceeding $800,000 and tax returns showing annual income exceeding $150,000. John Mayer promised to subsidize the hotel's operations until it turned a profit. Yet the Mayers had no intention of operating the hotel, underwriting its losses, or paying off the loan. They were serving as fronts for their friends Donald and Rosemarie Monti. Donald Monti and John Mayer had engaged in other real estate transactions; Rosemarie Monti and Deborah Mayer are first cousins, "inseparable" friends who rode horses together daily. The Montis could not have obtained the loan in their own names, because Donald was in bankruptcy and Rosemarie had no income. So the Mayers lent their name and financial statement; John Mayer signed a power of attorney authorizing the Montis to transfer the hotel to their own name by quit-claim

** Hon. Donald P. Lay, of the Eighth Circuit, sitting by designation.

deed and adding: "I have agreed to help Rosemarie K. Monti obtain a loan From the 1st Natl. Bank of Rockford. I, Dr. John E. Mayer, have no legal interest in the Bess Hotel." Any correspondence the Mayers received from the bank was passed, unopened, to the Montis.

The Montis could not make a go of the hotel and did not pay off the loan. The Mayers refused to pay a cent. A state court determined that the Mayers had taken out a loan, had signed all the papers, and are liable. The court ordered the hotel sold at foreclosure; a deficiency judgment of $187,-665.35 (including attorneys' fees and accrued interest) was entered against the Mayers on January 3, 1992. The Mayers sought to discharge that debt in their federal bankruptcy proceeding. The bankruptcy judge denied discharge under § 523(a)(2)(A) after concluding that the Mayers had defrauded the bank. The state court's judgment conclusively determines that the Mayers borrowed and owe the money. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). The Mayers concede that they never intended to repay. As the bankruptcy court saw things, that left only the question whether the bank reasonably relied on the Mayers' promise to pay. The Mayers said not, because the bank either saw or should have tracked down the power of attorney revealing that the Mayers were straw purchasers. The bank's loan officer testified that she had not seen that power of attorney, and the bankruptcy judge believed her. The bank had no obligation to search out such papers, the judge concluded, and was entitled to rely on the Mayers' written and oral promises. The district court affirmed. 173 B.R. 373 (N.D.Ill.1994).

The other transaction occurred in September 1990. By then John Mayer was in financial distress and unable to borrow from banks. He located Spanel International, which was willing to lend at substantially higher rates. A clinical psychologist specializing in adolescents with drug problems, Mayer told Dennis King, Spanel's owner, that he was working on a manual that would help schools deal with substance abuse among pupils. To add verisimilitude to this claim (and to fortify his representation that

he would be able to pay back the 90–day loan of $100,000), Mayer showed King a purchase order issued by the Chicago Board of Education for 5,000 copies of the manual, at a total price of $725,000. Spanel made the loan; Mayer did not repay the debt; the purchase order turned out to be a fake, with a forged signature. Mayer denied knowing that the purchase order was bogus and blamed his literary agent. The bankruptcy judge found that Mayer knew that the order was spurious and rejected his contention that King should have investigated its validity more thoroughly. (King had called the Board about the subject, but Mayer told him to stop snooping.) On reconsideration the bankruptcy judge withdrew his finding that Mayer knew of the forgery but concluded that Mayer was reckless in presenting the order to King. The bankruptcy court concluded that the debt may not be discharged, and the district court affirmed. 164 B.R. 83 (N.D.Ill.1994).

Section 523(a)(2)(A) forbids the discharge of any debt incurred by

> false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

Each of the district judges turned to *In re Kimzey*, 761 F.2d 421 (7th Cir.1985), for an exegesis of this text.

> To succeed on a claim that a debt is nondischargeable under section 523(a)(2)(A), a creditor must prove three elements. First, the creditor must prove that the debtor obtained the money through representations which the debtor either knew to be false or made with such reckless disregard for the truth as to constitute willful misrepresentation. *Carini v. Matera*, 592 F.2d 378, 380 (7th Cir.1979). The creditor also must prove that the debtor possessed scienter, *i.e.*, an intent to deceive. *Gabellini v. Rega*, 724 F.2d 579, 581 (7th Cir. 1984). Finally, the creditor must show that it actually relied on the false representation, and that its reliance was reasonable. *Carini*, 592 F.2d at 381. The party objecting to discharge must prove the facts establishing each element by clear and convincing evidence.

761 F.2d at 423–24. The Mayers insist that their creditors did not "reasonably" rely on their false statements—a term understood by both district judges (and by bankruptcy judges in some other cases) to entail proof that the creditor conducted an investigation reasonably designed to discover whether the would-be borrower is telling the truth. E.g., *In re Iaquinta,* 98 B.R. 919 (Bankr.N.D.Ill. 1989); *In re Smigel,* 90 B.R. 935 (Bankr. N.D.Ill.1988). John Mayer adds that he did not intend to deceive Spanel.

We confess to some doubt that *Kimzey* is an accurate guide to § 523(a)(2)(A). *Kimzey's* fourth requirement—that the creditor prove the statutory elements by clear and convincing evidence—has been disapproved by the Supreme Court, which thought *Kimzey* unduly influenced by the goal of providing debtors with fresh starts. *Grogan v. Garner,* 498 U.S. 279, 283 n. 7, 111 S.Ct. 654, 657 n. 7, 112 L.Ed.2d 755 (1991). Only the "honest but unfortunate" debtor can start anew, the Court observed, *id.* at 287, 111 S.Ct. at 659–60, and the process of classification should be conducted without a thumb on the scales. The rest of *Kimzey's* list likewise seems designed to stack the deck in debtors' favor, even to the point of doubling up on intent requirements (factors one and two require proof of different forms of intent to defraud). The exclusions in § 523 serve vital functions. Congress concluded that preventing fraud is more important than letting defrauders start over with a clean slate, and we must respect that judgment. See Thomas H. Jackson, *The Logic and Limits of Bankruptcy Law* 273–79 (1986) (identifying other restrictions on the fresh start policy).

■ *Kimzey* finds three ingredients in § 523(a)(2)(A): falsity, fraudulent intent, and reasonable reliance. The statute itself specifies only the first of these, speaking of "false pretenses, a false representation, or actual fraud". The word "fraud" implies a requirement of intent to deceive, see *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Neal v. Clark,* 95 U.S. 704, 709, 24 L.Ed. 586 (1877), but "fraud" is only one of three elements in the statutory list. By including "false pretenses [and] false representation" Congress may have done away with an obligation to show intent to defraud; otherwise what function do these words serve? Redundancy is common in statutes; we do not subscribe to the view that every enacted word must carry independent force. Neither, however, should one in a list of related but not identical terms be treated as if it were the whole shebang—not, at least, without strong evidence that at the time of enactment the words were understood as equivalents.

*Kimzey* took the intent requirement from *Carini v. Matera,* which interprets the Bankruptcy Act of 1898. Section 17(a)(2) of that Act, 11 U.S.C. § 35(a)(2), the portion closest in spirit and effect to § 523(a)(2)(A), forbade discharge of "[l]iabilities for obtaining money or property by false pretenses or false representations," language that to modern ears differs from "fraud" in lacking an intent component. It turns out that cases interpreting the 1898 Act got the intent ingredient from the Bankruptcy Act of 1867, which disallowed the discharge of debts "created by fraud." This was the language understood in *Neal* to require proof of intent to defraud. All reference to "fraud" disappeared from the Act in 1903, but courts of appeals paid no heed and the Supreme Court did not return to the subject. See generally 1A *Collier on Bankruptcy* §§ 17.01, 17.16[3] (14th ed. 1978) (tracing this history). Then the 1978 Code included both fraud and the more capacious "false pretenses [or] false representation" language, and again courts have acted as if nothing has changed.

■ Are we to treat the evolution of statutory language as meaningless? *Patterson v. Shumate,* 504 U.S. 753, 760–61, 112 S.Ct. 2242, 2248, 119 L.Ed.2d 519 (1992); *Union Bank v. Wolas,* 502 U.S. 151, 158, 112 S.Ct. 527, 531–32, 116 L.Ed.2d 514 (1991); and *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 1030–31, 103 L.Ed.2d 290 (1989), are a few among many recent cases telling us to take the 1978 Code on its own terms rather than as a restatement of earlier bankruptcy statutes. See also *Meyer v. Rigdon,* 36 F.3d 1375, 1378–82 (7th Cir.1994), adopting a plain-language understanding of § 523(a)(11). We hesitate, however, to strip all intent compo-

nents from § 523(a)(2)(A). Other courts of appeals recite that the 1978 Code has a mental state ingredient. See *In re Philip G. Menna Century 21 Balfour Real Estate*, 16 F.3d 7 (1st Cir.1994); *In re Foreman*, 906 F.2d 123, 127 (5th Cir.1990); *In re Phillips*, 804 F.2d 930 (6th Cir.1986); *In re Kirsh*, 973 F.2d 1454 (9th Cir.1992); *In re Mullet*, 817 F.2d 677 (10th Cir.1987); *In re Miller*, 39 F.3d 301, 306–07 (11th Cir.1994). We do not create conflicts among the circuits without strong cause. A conflict here would be gratuitous. *Kimzey* itself suggests that reckless disregard of the truth is a form of intent to defraud. See also *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1044 (7th Cir.1977); *Birmingham Trust National Bank v. Case*, 755 F.2d 1474, 1476 (11th Cir.1985). As we explain later, John Mayer was at least reckless in presenting the bogus book order to Spanel.

█ "Reasonable reliance" is a different kettle of fish. Language establishing a reliance requirement not only is missing from § 523(a)(2)(A) but also appears in § 523(a)(2)(B), where it is used to determine eligibility for a discharge when the debtor tells a fib in a financial statement—the category carved out of § 523(a)(2)(A). Congress deliberately distinguished the criteria for discharge according to the kind of document in which the falsehood appears; *Kimzey* did not explain why a standard applicable under § 523(a)(2)(B) should be applied to cases under § 523(a)(2)(A), unless the reason is that *Kimzey* was not thinking about the 1978 Code at all, and (as the panel's citations imply) was simply repeating criteria that had been developed under the 1898 Act. The "reasonable reliance" requirement has given us some headaches. E.g., *In re Scarlata*, 979 F.2d 521 (7th Cir.1992). And it has not found a wholly favorable reception in other circuits. Two courts of appeals have held that § 523(a)(2)(A) does not contain a reasonable-reliance requirement. *In re Allison*, 960 F.2d 481, 484–85 (5th Cir.1992); *In re Ophaug*, 827 F.2d 340, 343 (8th Cir.1987). Cf. *In re Phillips*, 804 F.2d 930, 933 (6th Cir.1986) (a creditor who relies "in bad faith" cannot block a discharge, but the creditor need not investigate). Several other courts have recited "reasonable reliance" or "justifi-

able reliance" as part of the inquiry under § 523(a)(2)(A), but only one of these has explored the question whether this standard is appropriate. See *In re Burgess*, 955 F.2d 134 (1st Cir.1992); *In re Kirsh*, 973 F.2d 1454, 1457–61 (9th Cir.1992) (discussing the subject; but this portion of the opinion appears to speak for only one judge); *In re Mullet*, 817 F.2d 677 (10th Cir.1987); *In re Hunter*, 780 F.2d 1577 (11th Cir.1986). Like *Kimzey* itself, most of these decisions proclaim a "reasonable reliance" standard as if the rationale for, and limits of, that phrase were obvious. The list in *Kimzey* was dictum to boot; nothing in that case turned on the reasonableness of the creditor's reliance.

█ Support for *Kimzey*'s pronouncement is hard to come by—at least if reliance, to be "reasonable" or "justifiable," includes an element of investigation. The common law of fraud has a mental-state requirement; it does not have any reasonable-investigation requirement. Indeed, it is precisely *because* fraud has a mental-state requirement that it lacks a reasonable-investigation requirement. Fraud is an intentional tort, and victims need not take precautions against such torts in order to preserve their rights. Tolerating fraud by excusing deceit when the victim is too easily gulled increases both the volume of fraud and expenditures on self-defense. Society is better off with less fraud and fewer precautions against it, and the common law has tailored the doctrine accordingly. In the standard formulation, contributory negligence is not a defense to an intentional tort. *Prosser & Keeton on Torts* 462 (5th ed. 1984); *Restatement (2d) of Torts* §§ 481, 482 (1965). We observed in *AMPAT/Midwest, Inc. v. Illinois Tool Works Inc.*, 896 F.2d 1035 (7th Cir.1990), that Illinois departs from this norm in fraud cases to some extent, using variations on the "reasonable reliance" or "justifiable reliance" formula. Federal law has not followed suit—and since 1970 the propriety of discharge in bankruptcy has been a question of federal law for reasons *Grogan* explains. For example, *Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522, 527–30 (7th Cir.1985), considers at length the question whether securities law requires an investor to investigate represen-

tations made to it; we held that it does not. See also *Sundstrand,* 553 F.2d at 1040. Accord, *Restatement* § 540; *Prosser & Keeton* at 749. "Reliance" is an element of fraud, but reliance in fact does not lose its status in law just because the victim is careless. A "reliance" requirement plays a different role. It excludes recovery if the investor knows or suspects the truth. Reliance means the conjunction of a material misrepresentation with causation in fact. 762 F.2d at 530; see also *Flamm v. Eberstadt,* 814 F.2d 1169, 1173 (7th Cir.1987). *AMPAT/Midwest* concludes that Illinois follows a similar path, that buyers (or lenders) do not have a duty of reasonable care, but that a buyer who ignores a known or obvious risk may not recover. 896 F.2d at 1042. See also *Astor Chauffeured Limousine Co. v. Runnfeldt Investment Corp.,* 910 F.2d 1540, 1546–47, 1549–50 (7th Cir.1990) (comparing the federal understanding of reliance with the one Illinois employs); *Dexter Corp. v. Whittaker Corp.,* 926 F.2d 617 (7th Cir.1991).

■ *Angelos,* this court's most extensive examination of a person's obligation (if any) to protect himself from being snookered, concluded that an intentional falsehood is not always enough. The lie must concern a material fact. Even a material lie may be disregarded when the victim is not actually taken in. For example, the victim may know the truth, having been given documents containing full information. Compare *Zobrist v. Coal–X, Inc.,* 708 F.2d 1511 (10th Cir.1983), and *Jackvony v. RIHT Financial Corp.,* 873 F.2d 411, 416 (1st Cir.1989) (Breyer, J.), with *Acme Propane, Inc. v. Tenexco, Inc.,* 844 F.2d 1317 (7th Cir.1988). More generally, an investor cannot close his eyes to a known risk. If the investor possesses information sufficient to call the representation into question, he cannot claim later that he relied on or was deceived by the lie. This is not because he has a duty to investigate lies or prevent intentional torts, though; it is, rather, because the false statement is not material under the circumstances. Similarly, if the falsehood concerns things known to the listener equally or better than to the speaker, the lie is not material and in all likelihood cannot play a causal role.

*Kimzey* was handed down almost simultaneously with *Angelos* and was written by a member of the *Angelos* panel. We think that the best understanding of the passing references in *Kimzey* to reliance is that this term means the same in the definition of fraud under bankruptcy law as in the definition of fraud under securities law: it denotes the combination of materiality and causation. See also *In re Garman,* 625 F.2d 755, 761 (7th Cir.1980) ("The creditor need establish only its reliance in fact, although its claim to reliance cannot be so unreasonable as to defeat a finding of reliance in fact."); *In re Kreps,* 700 F.2d 372, 375–76 (7th Cir.1983). A victim who lacks access to the truth, and has not been alerted to facts that would alert him to the truth, is not to be denied recovery under the securities laws—or be blocked by a discharge under the bankruptcy laws—just because he did not conduct a more thorough investigation.

■ So understood, the reliance element of § 523(a)(2)(A) offers the Mayers no comfort. The bank's loan officer testified that she had not seen the power of attorney by which John Mayer disclaimed any interest in the Bess Hotel; the bankruptcy judge believed that testimony, and his finding is not clearly erroneous. The bank therefore had neither actual knowledge of the fraud nor any strong reason to suspect one. Whether the bank should have done more to protect itself is a subject of sound banking practice. A lender wants a borrower willing and able to pay, rather than a claim in bankruptcy, but the fact that the lender ended up with a chose in action rather than cash in hand does not disqualify its claim. It relied on the Mayers' material misrepresentations. As the Mayers concede that they never intended to pay, § 523(a)(2)(A) forbids discharge.

■ John Mayer's attempt to shake off his debt to Spanel fares no better. King testified that he relied on the purported purchase order, which was unquestionably material to the transaction. The documentation for the loan so recited. King inquired of the Board of Education; when the person to whom King spoke could not verify that the Board had agreed to purchase Mayer's manual, Mayer wrote King that he had spoken

with the wrong person and warned him off from making further inquiries:

> Because of your call and fax to the Chicago public school system we are on the verge of losing our contact there. If you needed verification of our work I wish you could have had me put you in contact with the correct persons. You know how businesses work. Your call was a very costly one. If anyone contacts you from CPS on this, please just let them know you are satisfied with the origin of any documents. Any questions, call me directly.

Thus although King had doubts about the purchase order, Mayer specifically assured him that the doubts were unwarranted. Mayer does not contend that the size of the order (5,000 drug manuals for a district with 77 high schools and 476 elementary schools) or the price ($145 per manual) should have alerted Spanel that something was fishy. In the end Spanel actually relied on the purported purchase order, and it did not need to do more research to protect its ability to collect.

Mayer's letter also shows that he was at least reckless in telling Spanel that he had a purchase order for the drug manual. In the bankruptcy court, Mayer denied any knowledge of the purchase order's provenance; it was all his agent's doing, Mayer insisted, and how was he to know that his agent had given him an ersatz order? Yet Mayer told Spanel that he had actual knowledge of the purchase order, and just who to call to verify it. A man teetering on the brink of insolvency (as Mayer was) is unlikely to be indifferent to a contract promising five times his annual income. He cared enough about the subject to offer the purchase order as collateral; it is hard to swallow his later tale that he accepted this document from his agent without inquiry. Mayer had more cause than King to ask follow-up questions. Indeed, Mayer's letter to King suggests that Mayer well knew that the purchase order was phony. One stratagem of a defrauder is to enlist the aid of a confederate in "verifying" the truth of the representation. Success depends on sending the victim to the confederate; a call at random is likely to reach someone who is not in on the scheme. The letter implies that Mayer was worried that King's call, to someone who had not been enlisted, might set an inquiry in motion.

One final issue and we are done. John Mayer promised Spanel, and both Mayers promised the bank, to reimburse any attorneys' fees that the lender incurred in the process of collection. Bankruptcy judge Wedoff, relying on *Klingman v. Levinson*, 831 F.2d 1292 (7th Cir.1987), added the bank's attorneys' fees to the non-dischargeable debt; district judge Shadur affirmed. Yet earlier judge Wedoff, relying on *In re King*, 135 B.R. 734 (Bankr.W.D.N.Y.1992), had discharged Spanel's claim to attorneys' fees; district judge Leinenweber reversed. We agree with judge Wedoff's second thoughts. Attorneys' fees provided by contract are part of the debt, and if the principal and (pre-bankruptcy) interest on the debt are non-dischargeable, so are the other elements of the debt. Attorneys' fees, no less than the principal and interest, are the result of the fraud, and the perpetrator cannot escape the consequences. Accord *In re Luce*, 960 F.2d 1277 (5th Cir.1992); *In re Martin*, 761 F.2d 1163 (6th Cir.1985); *Transouth Financial Corp. v. Johnson*, 931 F.2d 1505 (11th Cir.1991). But cf. *In re Johnson*, 756 F.2d 738, 741 (9th Cir.1985). Under the American Rule, attorneys' fees would not be added to a debt as of course. *In re Fesco Plastics Corp.*, 996 F.2d 152 (7th Cir.1993). But if a debtor agrees by contract to pay legal expenses, this is no different in principle from agreeing to a higher rate of interest, or a balloon payment, or any other contractual element of compensation to the lender. Cf. *Security Mortgage Co. v. Powers*, 278 U.S. 149, 153–54, 49 S.Ct. 84, 85–86, 73 L.Ed. 236 (1928).

AFFIRMED