**In re Richard Scott FERGUSON, Debtor.**

**Barbara KADLECEK, Plaintiff,**

v.

**Richard Scott FERGUSON, Defendant.**

**Bankruptcy No. 96 B 04422.**
**Adversary No. 96 A 00677.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

July 24, 1998.

Timothy P. Whelan, Wheaton, IL, for Plaintiff.

William A. Lester, Lombard, IL, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

This Adversary proceeding relates to the bankruptcy case filed by debtor Richard Scott Ferguson ("Debtor" or "Defendant" or "Ferguson") under Chapter 7 of the Bankruptcy Code, Title 11 U.S.C. It was brought by plaintiff Barbara Kadlecek ("Plaintiff" or "Kadlecek") to bar dischargeability of Debtor's asserted debt to Plaintiff under 11 U.S.C. § 523(a)(2)(A) in Count I and also under § 523(c)(6) in Count II. Trial was held. At the close of Plaintiff's proofs, Count II was dismissed with prejudice on Plaintiff's motion. Trial concluded, and both sides rested. All pleadings by both parties were then ordered amended under Fed.R.Bankr.P. 7015 to conform to the evidence. Final argument was taken on Count I through written submissions.

Pursuant to evidence taken and argument considered, the Court now makes and enters the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

Barbara Kadlecek purchased a lot for home construction on May 24, 1994, at a location now known as 11419 South Heggs Road in Plainfield, Illinois ("the premises"). The lot was purchased from the developer of the subdivision known as Sunny Farm Acres. She negotiated with a number of builders to construct a home based upon her design ideas. Kadlecek is and was at that time a registered nurse employed at Central DuPage Hospital in administration, and she has had no home construction experience or background.

Richard Scott Ferguson was one of the builders she contacted for residential home building services. Ferguson testified that he operated Ferguson Custom Homes as a sole proprietorship; it was not incorporated.

At one of his early meetings with Kadlecek, Ferguson explained that he was experienced in home construction as a general contractor and had been in the home building business for twelve years. (At trial, he testified he had no formal training in any trade or by education; his background consisted of going to the library and talking to architects.) He told Kadlecek that he could prepare a design based upon the general ideas presented by her. He also informed her that he was a signatory to a "Code Plus" building agreement, one of the few such quality builders in the area.

A brochure for a "Code Plus" home was provided by Ferguson to Kadlecek at an early meeting between them. He told her that floors in a "Code Plus" home would feel stiffer and more solid and would not "give" when walked across. He also told Kadlecek during their negotiations that his homes would exceed minimum building code requirements. Ferguson further represented to Kadlecek that his plans and specifications would be approved by an architect to enable construction of a "Code Plus" custom home.

Based upon these representations, Kadlecek deposited $2,000.00 with Ferguson and continued to meet with him to develop the

design and floor plan she wanted for her home. All meetings were held in Ferguson's home office where the "Code Plus" brochure was framed and prominently displayed on the wall. Once the design concept was agreed upon, Kadlecek was presented with and signed a home construction contract on May 14, 1994, making an additional cash deposit of $14,000.00. Kadlecek stated she began the process of obtaining financing for the project with a company recommended to her by Ferguson.

Thereafter, Ferguson produced blue prints for construction of the home. He drew the plans. The first set of plans were incomplete as to the type of wood to be used in the floors and ceilings as well as other items.

Kadlecek reviewed a copy of the plans and submitted them to a building inspector of the City of Woodridge, a friend of her brother. Upon getting them back from that inspector, she informed Ferguson she had two concerns, one of which was that the span for the floor joists was quite large. She was informed by Ferguson that would not be a concern because he was going to use a stronger wood called "hem-fir" that would resolve any problems with the span. The plans were returned to Ferguson to complete them for construction. It was agreed a stronger wood, hem-fir, was necessary and would be used for the floors and ceilings due to the span of the foundation, and which would provide stability for the floors.

The plans were redone by Ferguson to incorporate the use of hem-fir in all the rooms as well as the ceilings and roof. The next set of plans Kadlecek saw had the designation "H/F" in drawings for floors in each of the rooms, thereby indicating that hem-fir lumber would be used throughout the construction. P.R.x12.[1]

Ferguson testified that the prior twenty-three homes he had built were all done with architect certification. But the plans in question were submitted to the Will County Building Department for approval. The

home site in issue here is in an unincorporated area in which the applicable construction code does not require an architect's certification. Each building inspector approved his plans without any changes prior to construction. The approved plans had the "H/F" designation shown for the floor joists. At no time during construction were any change orders to those plans requested or suggested by Ferguson. The plans did not specify the type of flooring or decking for in the home although architect Peterson, who testified as Ferguson's witness, stated it was normal to include that detail in such plans. Ferguson was under the impression he had placed that material item on the plans, but could not locate it when asked to do so during an in-court examination of the blueprints.

Construction was undertaken by Ferguson on the single-family, full basement design on or about July 6, 1994. Ferguson testified that the lumber was the first thing delivered to the site to be able to frame the house. He knew the builder delivered SPF rather than the hem-fir called for on the plans. His own architect witness Petersen and Kadlecek's expert witness Marcotte both indicated that, if the lumber yard provides the wrong lumber, a builder should not accept it unless there is an appropriate change order with consent of the customer.

Ferguson presented a list of subcontractors and costs for each trade as well as his own fees to the finance company to fund the construction. The house was completed in early November 1994, and was inspected by the Will County Building Department for occupancy and, during construction, by the finance company. Kadlecek stated it was made clear to her the finance company inspection was to make certain the work was performed, not to inspect the quality of the workmanship or compliance with the plans.

A closing, or what was called at trial a "settlement conference" to finalize details under the contract, was held on November 11, 1994. At the November 11 conference, Fer-

---

1. The set of plans used at trial in this matter were obtained by Kadlecek well after construction was completed. The set of plans she originally had in her possession, she testified, had the "H/F" markings for all floors, but the later obtained plans presented as an exhibit had a designation of "SPF" for one of the floors in the layout although "H/F" is shown for the floor joist detail plan to the left of the layout.

guson presented Kadlecek with a certificate identifying the house as a home of "Code Plus" construction. He further advised Kadlecek of construction warranties in writing. In that document, he clearly confirmed to Kadlecek that "[t]he plans for your customized home were adjusted, reviewed, and approved by a professional architect experienced in single-family residential design." However, Ferguson has now acknowledged that those plans were never approved by an architect. Various punch list items remained to be completed which Ferguson indicated would be done as warranty work. The final paperwork was signed, and Ferguson then received his final payout. It was unclear from the evidence what the net amount was of his final payment. (According to the contract, Ferguson was to receive interim payments of $56,000, $48,000, and $24,000, and the amount to be received at settlement was plus or minus extras or credits.)

Kadlecek did not occupy the premises immediately, but first moved her furniture into it in early December. Immediately upon moving the furniture into the property, Kadlecek observed an unusual amount of give and bounce in her floors. She noted that her glass and china would shake loudly with the slightest pressure on the flooring. When the dog walked across the floor, the shaking occurred. She could feel the bounce while walking or just standing in place, moving up and down.

Kadlecek called Ferguson and requested him to investigate the problem in compliance with the warranties. She was requesting other warranty work be performed at the same time according to the punch list items.

Ferguson investigated the condition and issued a written response to Ms. Kadlecek. He attributed the bounce to "harmonic joist deflection vibration." In the letter, he reaffirmed that he had used "a material (Hem-Fir) stronger than required" for the joists. He dismissed the problem as a normal condition in the type of home she had. He concluded that Ms. Kadlecek's complaint concerning the flooring was not a problem. Attached to the letter was a copy of the floor joist plan confirming the use of hem-fir ("HF") in the construction.

Kadlecek continued to complain to Ferguson. He placed metal cross joists under the floor, but that action did not correct the problem. At that point Ferguson was unwilling to do more in response to Kadlecek's continuing complaint about the floors.

Kadlecek then made a tracing of the watermark on the lumber used in the house. After that point, she determined that those markings indicate the wood used was not "hem-fir" but a wood designated as "SPF." She learned at this time that SPF was not as strong as the hem-fir wood Ferguson had undertaken to use and then represented he had used for the construction. Upon learning this information, Kadlecek engaged the services of a structural architect.

Between December and June 1995, Kadlecek was in continuous contact with Ferguson to have the warranty/punch list items completed. When asked by Kadlecek during this time period whether "Code Plus" construction meant her floors were supposed to be firm and strong, Ferguson responded that her home and floors were built to code.

The tracing and plans were submitted to her architect, Robert Varnes, and he conducted an inspection of the premises with specific attention to the floors. Varnes conducted his inspection June 26, 1995. He submitted a report which addressed the flooring problem. In the report, Varnes confirmed and identified the condition complained about by Kadlecek with the floors. He testified that the bounce or deflection in the floor was unusually excessive. The cause, he concluded, was partly because of the SPF wood used in construction and partly due to use of particle board (a material Ferguson identified as Orient Strand board) instead of plywood for the floor decking. Varnes estimated the cost difference between SPF and hem-fir at the time was $30.00 per board. Varnes had certain suggestions for modifications to the home to resolve the problems. At trial, he estimated that cost of repair to solve the flooring problem could range from $20,000 to $25,000.

Kadlecek advised Ferguson of the Varnes report and requested that he meet with Varnes. A meeting was held with Kadlecek,

Varnes, Ferguson, and Petersen (an architect brought by Ferguson) on August 2, 1995. The purpose of the meeting was to discuss the problems identified by Mr. Varnes and to suggest remedies. At that meeting, Ferguson admitted that construction plans had not been reviewed or approved by an architect. He gave no explanation at the meeting for the difference in the lumber used during construction. A further inspection was done in the basement by all present at the meeting. Kadlecek testified she recalled Petersen, identified as Ferguson's architect, stating that spacing of the joists was greater than he would have used and that he never would have used the decking product for floors. When questioned at trial, he did not recall those comments.

Ferguson agreed in the meeting to make certain modifications to the floor areas. He put that agreement in writing the next day in a letter to Kadlecek and Varnes. In that correspondence, he claimed that the "Hem-Fir" designation was ". . . mistakenly specified on a portion of the plans." Nonetheless, Ferguson indicated certain modifications would be made to attempt to resolve the floor problem.

The work he agreed to perform to resolve the problem with the floors was done in August of 1995. That work was intended to add weight to the existing floor joists and thereby stiffen or firm up the floor. Unhappily, as trial evidence showed, the work he then performed was incomplete, improperly fastened to the existing joists, and in some cases the boards were cut, reducing any effective support. According to Robert Varnes, if the work had been done properly, it might have reduced the extent of the problem. However, this modification had only a limited and slight effect on the bounce in the floor. The problem persisted in the property, even to the time of trial.

Mark Marcotte testified he inspected the property approximately one year prior to the trial at the request of Kadlecek. He is a qualified builder of hundreds of residential homes and a carpenter by trade. Marcotte found the springy or bouncy floor persisted at a time that post-dated the Varnes' findings and the modifications done by Ferguson.

The problem still existed even upon determining that a bathroom had been built in the basement area with a wall that added some additional support. Marcotte identified the cause of the problem to be the lumber used, the type of decking used, and the spacing of the spans for the joists. He indicated that parts of a house are put together to add support and counter-support to each part so that it is impossible to state that there was one only cause for the floors to bounce, but all of the inadequacies contributed to the bounce. A builder, Marcotte stated, would be motivated to use a different lumber and decking to save cost and increase his profits.

Marcotte testified that his proposed solution would be to add steel to the understructure of the flooring. This can only be accomplished by removal of a portion of the foundation and addition of vertical support for the steel on footings properly dug out, filled, and constructed with concrete footings in the basement floor. He estimated the job would require between $20,000 and $25,000 for labor and material.

Robert Varnes confirmed the existence of the problem with regard to bouncy floors. He opined that the problem was due to use of the softer SPF lumber. He added that the Orient strand board used for the flooring is a particle board product that detracts from the firmness of the floors that can better be assured by use of plywood. Plywood is the product the "Code Plus" brochure pictured to be used for the decking for the floors. Varnes testified that construction plans were viewed in the construction industry as part of the contract with the customer. Varnes estimated that repair of the problem would probably exceed $20,000.

Both Varnes and Marcotte testified that building departments require change orders if material alterations are made to construction plans. Ferguson testified no change orders were requested or made to plans approved by the Will County Building Department. The approved plans had the markings "H/F" (hem-fir) for lumber to be used for floor construction. When asked if that meant the use of "SPF" was contrary to the building department authority approval of

the plans, Ferguson had no comment about that.

The balance due for all construction on Plaintiff's house was paid for in full at the settlement meeting pertaining to the property. Any modifications or changes to the plans during construction were done by way of change orders. All change orders approved by Barbara Kadlecek were paid for in the final payment for construction costs. No amounts were outstanding after that settlement meeting. Punch list items were completed, if at all, as warranty items which, pursuant to the contract, were at no cost to the owner. No demand for any additional amounts due were made to Kadlecek by Ferguson or his representatives at the closing.

The preponderance of evidence presented at trial has demonstrated that Ferguson, early in his relationship with Kadlecek, made a representation that the plans for the construction of her home would be approved and certified by an architect. Further, he represented the home would be built to a higher standard than the minimum code requirements, a "Code Plus" construction that Ferguson specified with a brochure. It was implied through use of the brochure portraying plywood for decking in a "Code Plus" home supposed to have specially sturdy floors that plywood decking would be used. These representations were made to induce Kadlecek into signing a contract with "Ferguson Custom Homes," Ferguson's custom home company. Indeed, Kadlecek testified these were the selling factors that caused her to enter into the contract with Ferguson as opposed to other builders.

Ferguson restated his representations in writing at the settlement conference, expressly stating that an architect had reviewed and approved the plans and also reaffirmed that the property was built as a "Code Plus" home with stiffer, firmer floors by his presentation of a certificate to that effect at settlement. In light of the contractual obligations to use hem-fir as specified in the plans, and Ferguson's later misrepresentation that he had in fact used hem-fir, the certificate of a "Code Plus" home at the closing was an implied representation and pretense that he had used the stronger wood

as called for in the plans. Moreover, use of the "Code Plus" certificate at the closing was a representation and pretense that he had used the plywood (as portrayed in the brochure and certificate) in construction rather than the lesser quality particle board actually used. All those representations and pretenses were false: No architect reviewed the plans; hem-fir was not used; and particle board was used in the decking instead of plywood.

Robert Varnes stated in his testimony that, had the plans been reviewed by an architect, the problems with the floor could have been avoided. Indeed, Ferguson's own witness Petersen would not have approved the plans had he been hired to do so. Ferguson knew prior to taking his last payout at the time of settlement that he did not obtain architectural approval. His explanation was that he did not need such an approval in unincorporated Will County, but he admits that he never advised Kadlecek of that fact. To the contrary, he persisted in his several misrepresentations and pretenses to obtain the final payments claimed due at the settlement meeting. His counsel now strains with an argument that the Plan given to Plaintiff showed no architect's approval by signature or seal, so she should have been aware that none was used. However, while a knowledgeable lawyer or builder familiar with construction practices might be said to be expected to notice and understand such an omission, it is not to be expected that an inexperienced lay person should have such knowledge or responsibility.

Similarly, at the time of that settlement conference, Ferguson was aware the property was not built to any standard other than minimum code for the unincorporated area. He had held himself out to being a builder of a higher than building code requirements with an assurance of plywood decking for strength and firmness in the floors. He was completely aware at the time of settlement that he used a particle board, Orient strand board, not the stronger, more effective plywood that his use of the "Code Plus" certificate pretended when he gave it to Kadlecek at closing to induce her pay her balance due.

Ferguson further promised that he would use Hem-Fir, a lumber stronger than SPF, for construction of the Kadlecek home. Yet, when the lumber showed up from the sub-contractor as "SPF," a wood Ferguson knew to be less than acceptable for the job, he went ahead and used it without any word to the customer or any change order approved by her. When the wrong wood was delivered at the time construction was to begin, his options were to advise the customer and change the plans or send the product back for the proper material, the material that would have made for a stronger, firmer floor. Instead, he installed the cheaper product to expand his profit margin and misrepresented to the customer in order to obtain the final contract payment.

At time of settlement and throughout the major payouts on the contract, Ferguson knew full well he had used less expensive and less sturdy products, both for the wood joists and the decking, but represented and pretended the contrary.

Ferguson persisted in his deception after the settlement, sending a letter to Kadlecek assuring her the stronger wood had been used. It was only after being confronted with the information from Robert Varnes that he fell back on the assertion that his statements to Kadlecek and plans showing that stronger wood was to be used and his letter in December 1995 were all "mistakes." He now argues, in an attempt to shift the fault upon his deceived customer, that since Plaintiff ultimately found markings on the wood showing SPF instead of hem-fir, that she could have found the same earlier. However, a detailed examination by her of the underfloor area was required to find the truth, hardly a cursory examination of an obvious or readily apparent fact. A deceptive builder can hardly argue that his lay customer did not rummage into the underfloor to find cryptic markings on the wood showing his deceit.

Ferguson claimed at trial that the heavy furniture placed in the house by Kadlecek has caused the problem. It is far fetched to expect a consumer wanting to have a custom home built to identify a weight load or restriction for floors in that home. In fact, contrary to Ferguson's suggestion, his architect friend Petersen testified that heavier furniture would add greater stability to the floor.

Kadlecek justifiably relied on Defendant's representations. She had no background in construction or in the building trades. She came to Ferguson for his purported expertise in general contracting for residential property. She is and was at the time a nurse in administration at Central DuPage Hospital. Although educated and capable in the usual affairs of life, she was an ordinary consumer embarking on a huge undertaking of building her own home and investing her life savings. Kadlecek looked to Defendant as someone who purported to be well qualified and capable in the residential construction business. Once Kadlecek had placed her faith and trust in Ferguson's supposed expertise, it was far from likely that any representation made related to construction would be taken by her to be anything but true. When Kadlecek deposited the first $2,000 and then another $14,000 and signed that contract for construction, she was certainly justified in relying upon Ferguson's statements, direction, and representations related to the construction of her home. Most particularly, she justifiably relied on his false representations and pretenses made both before and after construction that hem-fir had been used, that plywood had been used to make solid floors, and that an architect had reviewed the plans. While Defendant correctly argues that lack of use of an architect by itself was not shown to have injured Plaintiff, in combination with the other deceptions this one lulled Plaintiff into a false sense of security concerning construction. All those false representations and pretenses, including those pertaining to an architect, therefore involved matters of very material facts, the falsity of which was not apparent to her without close investigation. Defendant's misrepresentations and deceptions were moreover intentionally made to deceive Plaintiff as shown by his repetition of them throughout his dealings with Plaintiff. As a result, Plaintiff now has defective floors requiring remedial work that will cost her at least $20,000.

Further factual findings set forth in the Conclusions of Law will stand as additional Findings of Fact.

### CONCLUSIONS OF LAW

█ This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1334(b) as a matter arising under 11 U.S.C. § 523(a). Pursuant to 28 U.S.C. § 157(b)(2)(I), this action is a core proceeding since it relates to the dischargeability of debts.

The basic elements of this action under Count I are set forth in the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A), which excepts from discharge those debts which are:

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

█ "The burden is on the objecting creditor to prove exceptions to discharge." *Matter of Scarlata*, 979 F.2d 521, 524 (7th Cir.1992), citing *Minnick v. Lafayette Loan & Trust Co.*, 392 F.2d 973, 976 (7th Cir.) *cert. denied sub nom. Lusk v. Strickland*, 393 U.S. 875, 89 S.Ct. 170, 21 L.Ed.2d 146, *reh'g denied*, 393 U.S. 956, 89 S.Ct. 379, 21 L.Ed.2d 370 (1968). "In bankruptcy 'exceptions to discharge are to be construed strictly against a creditor and liberally in favor of the debtor.'" *Matter of Scarlata*, 979 F.2d at 524 (citing *In re Zarzynski*, 771 F.2d 304, 306 (7th Cir.1985)).

█ To succeed in recovering under 11 U.S.C. § 523(a)(2)(A), the creditor must prove that (1) the debt arose through conduct of the debtor amounting to fraud, false pretenses, or representations known by the debtor to be false (or made with such reckless disregard for the truth as to make the representations constitute willful misrepresentations); (2) the debtor had actual intent to deceive the plaintiff; and (3) to the plaintiff's detriment, she justifiably relied on the pretense or misrepresentations. *Mayer v. Spanel Intern. Ltd.*, 51 F.3d 670, 674, 676 (7th Cir.1995), *reh'g denied, cert. denied*, 516 U.S. 1008, 116 S.Ct. 563, 133 L.Ed.2d 488

(1995); *In re Paneras*, 195 B.R. 395 (Bankr. N.D.Ill.1996); *In re Barr*, 194 B.R. 1009 (Bankr.N.D.Ill.1996); *In re Scarlata*, 127 B.R. 1004 (N.D.Ill.1991), *aff'd in part*, 979 F.2d 521 (7th Cir.1992), *reh'g denied* (1993).

The Court of Appeals for the Seventh Circuit considered the issue of an intentionally false representation of a material fact in bankruptcy cases in *Mayer v. Spanel Intern.*, 51 F.3d 670, referring to an earlier opinion:

*Angelos*, this court's most extensive examination of a person's obligation (if any) to protect himself from being snookered, concluded that an intentional falsehood is not enough [to support liability]. The lie must concern a material fact. Even a material lie may be disregarded when the victim is not actually taken in. For example, the victim may have been given documents containing full information.

*Mayer v. Spanel Intern., supra*, at p. 676, ¶ 14.

The Supreme Court has considered

... the level of a creditor's reliance on a fraudulent misrepresentation necessary to place a debt thus beyond release. While the Court of Appeals followed a rule requiring reasonable reliance on the statement, we hold the standard to be the less demanding one of justifiable reliance....

*Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351, 366 (1995).

However, the Supreme Court examined the Restatement (Second) of Torts (1976) and went on to state:

Justifiability is not without some limits, however. As a comment to parl. 541 explains, a person is "required to use his senses and cannot recover if he blindly relies upon a misrepresentation, the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation."

Similarly, the *Mayer* opinion considered the limits upon a creditor's justifiable reliance on false representation in bankruptcy cases:

More generally, an investor cannot close his eyes to a known risk. If the investor possesses information sufficient to call the

representation into question, he cannot claim later that he relied on or was deceived by the lie. This is not because he has a duty to investigate lies or prevent intentional torts, though; it is rather, because the false statement is not material under the circumstances.

*Mayer v. Spanel Intern.*, 51 F.3d at 676.

A party seeking to establish an exception to the discharge of debt bears the burden of proof. *Goldberg Securities Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521 (7th Cir.1992). The burden of proof required for establishing an exception to discharge is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *In re Sheridan*, 57 F.3d 627 (7th Cir.1995).

■ There is a single test for the first element (debtor's knowing use of false misrepresentation or pretense). *In re Bryson*, 187 B.R. 939 (Bankr.N.D.Ill.1995). The scienter element may be inferred from the circumstances presented in evidence as well as the direct actions and testimony of the parties. *In re Kimzey*, 761 F.2d 421 (7th Cir.1985). The reliance standard applicable is one of creditor's justifiable rather than reasonable reliance. *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). The inquiry will focus on whether the falsity of the representation was or should been readily apparent to the person to whom it was made. It is a less exacting standard than "reasonable" reliance.

■ Debtor's intent to deceive may be inferred from a false representation which the debtor knows or should know will induce another to advance money to him. *Kimzey*, 761 F.2d 421.

In *Kimzey*, the debtor, the owner of a small chemical company, entered into an agreement with the bank to lend money for orders already shipped to customers. The debtor used the loaned money to purchase merchandise from his suppliers to fill new orders. The Circuit found that scienter could logically be inferred by debtor's false representation as to the actual purpose of the loan:

Since, as the bankruptcy court found, the agreement was to loan money for orders Kimzey had already shipped, Kimzey

knew or should have known that he could not obtain loans with the thirteen unshipped orders unless he represented to the bank that he had not shipped the goods. It was therefore not clearly erroneous for the bankruptcy court to find that the bank had proved scienter.

*Id.* at 424.

This Court has visited issues related to dischargeability in a home construction contract in its Findings and ruling in *In re Barr*, 194 B.R. 1009 (Bankr.N.D.Ill.1996). There it was determined that the debt was discharged in light of the creditors inability to demonstrate misrepresentations under § 523(a)(2)(A) or the requisite intent to defraud the customer at the time the contract was made. *See also In re Kaufmann*, 57 B.R. 644 (Bankr.E.D.Wis.1986) (ruling that debt was not excepted from discharge where contractor had merely bitten off more than he could chew and did not have intent to deceive). However, the factual circumstances here are quite different.

The misrepresentations in *Barr* and *Kaufmann* were far more general than material misrepresentations made and false pretenses advanced by Ferguson in this case. Ferguson began with assurances that an architect would be used to put Kadlecek at ease. He persisted in that assurance up to the date of settlement, even placing it in writing, falsely representing that an architect had in fact been used. This fundamental misrepresentation repeatedly pronounced tends to infer that Ferguson never intended to use an architect on this project because it was not required by the applicable building codes in the unincorporated area involved here.

■ The further misrepresentation by Defendant that he would build a home to "Code Plus" quality was designed to attract the consumer, and he certainly attracted Kadlecek by that. The claim was more than just puffing, because he held himself out as providing a special quality as a builder.

These two representations were key to Kadlecek in choosing Ferguson over any other builder as her general contractor. They were assurances and qualities she, as a novice in home building, was looking for to fulfill

her dream of her own custom-built property, and they both certainly had the effect of lulling her into a belief that she could justifiably rely on Ferguson's other representations.

While it cannot be said that Ferguson was shown to have intended to use the cheaper wood when the contract was signed, he did misrepresent on that subject after the work was done and he knew what he had installed. Ferguson made a contractual commitment to use a stronger type of lumber for the joists because of the unusually long span, but then used the cheaper, less effective wood instead. At the closing, his pretense and misrepresentation of having complied with his promise for and plans showing hem-fir was explicit. He also pretended at that time through his use of a "Code Plus" certificate that he had used plywood in the decking when instead he had used particle board. These false misrepresentations and pretenses after construction proved to be material in attempting to hide the reasons for defects in Kadlecek's home along with Ferguson's phony story about using an architect certainly induced her to pay at closing the balance due by her under the contracts.

Ferguson's misrepresentations were made and pretensions engaged in to save cost and increase Defendant's profitability. He did not pay an architect. He did not pay for plywood when he used particle board for the decking. He did not pay for hem-fir when he thought he could use SPF and not be discovered.

■ During the course of the trial proceedings, on motion of the parties, an order was entered that allowed the pleadings to conform to the proofs. Although the Plaintiff did not expressly plead a case of false pretenses, the facts as they have developed at trial substantiate such a claim. False pretense has been defined as an implied misrepresentation or conduct intended to create and foster a false impression. *Bryson,* 187 B.R. at 959. The Seventh Circuit requires the court to apply a single test to prove a "false representation" and a "false pretense." *Mayer v. Spanel Intern.,* 51 F.3d 670.

In *Mayer,* where there were two debtors, it was held:

In order to except "false pretenses," "fraud," or a "false representation" from dischargeability under § 523(a)(2)(A), the Plaintiff must establish the following elements: (1) both debtors obtained the funds at issue through [debtor's] false pretenses or representations he [sic] either knew to be false or made with such reckless disregard for the truth as to constitute willful misrepresentations; (2) both debtors possessed the requisite scienter, i.e., they actually intended to deceive the Plaintiff; and (3) to his detriment, the Plaintiff justifiably relied on the misrepresentations.

*See also In re Jacob,* 1998 WL 150493, *4 (Bankr.N.D.Ill.1998) (citing *Field v. Mans,* 516 U.S. at 74–75, 116 S.Ct. 437; *Sheridan,* 57 F.3d at 635; *Scarlata,* 979 F.2d at 525).

■ The key character of false pretenses appears to be a series of events or communications which collectively create a false or misleading set of circumstances in which the creditor is wrongfully induced by the debtor to transfer property; it is multiple events done willfully, knowingly, and by design. *In re Paneras,* 195 B.R. 395 (Bankr.N.D.Ill. 1996).

The series of preliminary meetings held between the parties, the development of the design and plans, the construction process with payouts along the way, and finally the settlement to get the last payout are the series of events or communications that Ferguson engaged in to perpetuate the image that he was a reputable and capable builder. At each stage he claimed the support and oversight of an architect, making it clear to the customer that he himself was not an architect, but the design and plans would meet an architect's standard of review and approval. At each instance he made claim to building to an industry standard that would exceed the minimum building code requirements and assure the customer of stronger, sounder roofing and flooring. He contracted and assured the consumer that a stronger wood would be and was being used to meet the design expectations.

Throughout the course of the construction process he knew that "Code Plus" industry standards were not being met because ply-

wood was not being used on the decking. He also knew that SPF, a less expensive lumber than hem-fir, was being used (and he was saving $30 a board, but not passing that savings on to his customer).

He never told Kadlecek of his unilateral material modifications to the plans and deviations from his promises, pretenses, and representations. Thus, he created material false impressions about his work on which she justifiably relied to her considerable detriment.

### Damages and Counterclaim

Defendant clearly breached his contract with Plaintiff in several respects described above. The resulting damages she suffered can best be measured by what it would cost her to employ a new contractor to install remedial construction. Two knowledgeable witnesses estimated costs of such work as between $20,000 and $25,000, but neither supplied detailed estimates or bids. The evidence supports a finding that remedial costs would run at least $20,000, but absent more detailed evidence, a higher consequential damage cannot be awarded. Therefore, Plaintiff's damages are fixed at $20,000, and judgment will be rendered for Plaintiff in that amount. Under 11 U.S.C. § 523(a)(2)(A), that debt will by separate judgment be held non-dischargeable.

Plaintiff also argues that her out-of-pocket costs incurred to hire experts to investigate and help prove her case should also be allowed as damages. Whether the same are recoverable need not be considered because the costs of such expenses were not offered into evidence through paid bills.

Lastly, the Debtor is seeking to recover by counterclaim or setoff $1,480 for work performed post-settlement, yet listed on his Exhibit CP# A as "Items given @ No Charge, Paid By Contractor." The items include an architect fee of $50 which, by the Debtor's Exhibit CP# 22, relates to Mr. Petersen's inspection of the bouncy floor joist, and Debtor's Exhibit CP# 23, which reflects $524.60 for lumber, but for which the Debtor is claiming $673, all related to the modifications he agreed to add to the floor joists. In the contract, it is expressly stated in paragraph 9:

The parties hereto agree that the Contractor's sole liability hereunder shall be to provide the necessary labor and materials to correct workmanship and materials originally furnished by or through the Contractor hereunder resulting in structural defects occurring within one year from the date of settlement.

The work performed as to which setoff or counterclaim is asserted was certainly structural and need for that work became apparent within the year after settlement. Therefore, such work was warranty work which under the contract was an obligation of the Defendant, not an extra. All work on which Defendant's claim rests was agreed upon by the parties to be the responsibility of the contractor, and his counterclaim or setoff assertion therefore has no merit.

### CONCLUSION

·Wherefore, by separate judgment to be entered, Plaintiff will receive judgment for $20,000, the same being non-dischargeable under 11 U.S.C. § 523(a)(2)(A).