In re Robert J. FOSCO, Debtor.

Sarah Fosco, Plaintiff,

v.

Robert J. Fosco, Defendant.

Bankruptcy No. 01 B 23359.
Adversary No. 01 A 01093.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Dec. 10, 2002.

Richard W. Hillsberg, Lester A. Ottenheimer III, Buffalo Grove, IL, for debtor.

Gina B. Krol, Cohen & Krol, Chicago, IL, trustee.

### Memorandum Decision

BRUCE W. BLACK, Bankruptcy Judge.

Section 727 of the Bankruptcy Code [1] (the Code) mandates that the court grant to a chapter 7 debtor a discharge of all debts unless a complete denial of discharge is warranted under one or more of the enumerated grounds listed in section 727(a). Section 523(a) of the Code, on the other hand, specifically excepts various categories of debt from the general discharge granted under section 727. Thus, a finding under section 727(a) prohibits bankruptcy relief entirely, while a finding

---

1. *11 U.S.C. § 101–1330.*

of nondischargeability under section 523(a) simply prohibits the discharge of a specific debt.

The matter before the court is an adversary proceeding by Sarah Fosco (Sarah) against Robert J. Fosco (Robert or Robert Jr.) challenging the dischargeability of a debt under both section 727 and section 523. At trial the parties presented evidence on Counts I, II, and IV of the complaint. Count I of the complaint asserts non-dischargeability due to fraud under section 523(a)(2) of the Bankruptcy Code. Count II seeks to have the debt deemed nondischargeable alimony, maintenance, or support under section 523(a)(5) of the Code. Count IV asserts that portions of Robert's original bankruptcy petition were false and he should therefore be denied any discharge in this case pursuant to section 727(a)(4) of the Code. Count III, which had asserted a cause of action under section 523(a)(15) of the Code, was dismissed on an oral motion by plaintiff's counsel prior to the hearing.

For the reasons set forth below, I hold that the debt to Sarah Fosco is nondischargeable under counts I and II. I further hold that Sarah has not proved Count IV. The remainder of this opinion constitutes my findings of fact and conclusions of law in support of my holding.

### Facts

1. Sarah and Robert Fosco were married on June 15, 1991. The parties were divorced pursuant to a Judgment for Dissolution of Marriage ("divorce judgment") entered on September 19, 2000 in the Circuit Court of Cook County ("circuit court"). Sarah and Robert have two minor children, Devin L. Fosco and Aaron T. Fosco, who reside with Sarah. The divorce judgment awarded sole custody of the children to Sarah.

2. Sarah has an eleventh-grade education. She is employed in the bakery at a Dominick's Finer Foods store. Robert has a high school diploma and has completed some college level coursework. Additionally, Robert has participated in some relatively sophisticated business arrangements with his father, including a partnership owning real estate, at least two family-owned corporations, and a jointly held brokerage account at one point worth $67,000. Robert is employed by a YMCA.

3. Beginning in 1991, upon their engagement, Sarah gave Robert $100 per week out of her paycheck because he had informed her that he was saving money for a house downpayment. Additionally, Sarah and Robert received $23,000 in cash from guests at their wedding, and Robert told Sarah he would deposit those funds in their account for the house downpayment.

4. For the first year of their marriage, Robert and Sarah lived with Sarah's parents. In June of 1992, the couple moved into the house at 590 W. Berkely, Hoffman Estates, IL 60194 ("the Berkely property"). At that time, Robert told Sarah that they had purchased the house and it was theirs. When the couple spoke to third parties about "their" house, Robert never denied that he and Sarah owned it.

5. Once Sarah and Robert moved in to the Berkely property, Sarah's father, Thomas King, helped the couple do several major renovations. Mr. King testified at trial that he is in the construction business and trades professional services with other contractors. With help from his contractor friends and with some help from Robert, Mr. King painted the inside and outside of the house, installed new carpeting, laid tile in the bathroom, installed sliding glass doors, and had some electrical work done. Mr. King also enlisted an architect friend of his to draw up plans for an addition to the living room of the house. Mr. King testified that had he known or

believed Sarah and Robert were merely renting the property, he would not have undertaken such elaborate work on the house, as this type of work would more appropriately be a landlord's responsibility.

6. In September of 1992, after Devin was born, Sarah began babysitting. She babysat through November of 1993, when she quit babysitting and returned to work at Dominick's. Sarah remained continually employed at Dominick's throughout the duration of the marriage. The couple separated in May of 1996. From September 1992 through the separation, Sarah turned over the bulk of her paychecks to Robert, who told her he needed the money to pay their mortgage.

7. Sarah filed for divorce in 1997. In September of 2000 the circuit court held a trial on the divorce. Because no court reporter was present at the divorce trial, there are no transcripts available to clarify the testimony, findings, or rulings from that proceeding.

8. Whatever evidence was presented at the divorce trial, the circuit court concluded that the Berkely property was marital property. As spelled out in the judgment, the court found that "the house ... was given to Robert Fosco however the parties put the house together as part of a common plan through their common funds and efforts throughout the marriage and the house belongs to the parties, Robert and Sarah Fosco."

9. As of September 19, 2000, the date of the divorce judgment, equity in the Berkely property was determined by the circuit court to be $150,000.

10. Of that $150,000, Sarah was awarded $75,000 as her share of the marital interest in the property. Robert was to pay Sarah her share of the interest in the property within 30 days of entry of the divorce judgment.

11. Whether the Berkely property was marital property was litigated in the circuit court. The issue was resolved by a final order which was not appealed. Nevertheless, much of the evidence presented at the bankruptcy trial went to the issue of whether the parties ever owned the house.

12. When Robert filed his petition under Chapter 7 of the Bankruptcy Code, in July of 2001, he listed his home address as 590 W. Berkely, Hoffman Estates, IL, but on Schedule A he stated that he had no interest in any real property.

13. The attorney who filed Robert's schedules, Lester Ottenheimer, testified that he had seen the divorce judgment and its statement that the house was marital property. To verify this information, he performed a title search on the Berkely property. The search indicated that the property was held in a land trust, the beneficiaries of which were Robert's parents and another couple with whom Robert's father frequently does business. The search gave no indication that Robert ever had any interest in the property. Based on the results of the title search, Mr. Ottenheimer advised Robert not to list the property on his bankruptcy schedules.

14. After speaking to the trustee at the meeting of creditors, however, Mr. Ottenheimer amended Schedule A to reflect the statement in the divorce judgment that the house was marital property. He did so in spite of his continued belief that Robert had no interest in the property.

15. On the issue of ownership of the Berkely property, there was undisputed testimony at the bankruptcy trial that Robert once had a partnership interest in the Berkely property. Robert and his father, Robert Sr., each contributed $8,000 to an entity they named "The Fosco Part-

nership." The purpose of this partnership was to invest in rental properties.

16. Though the testimony is not crystal clear on this point, it appears that the Roberts, Jr. and Sr., initially invested the partnership funds in a property in Wheeling, Illinois ("the Wheeling property"). Robert Sr. and his business associate, David Hussey, had already purchased the Berkely property and placed it in a land trust. This was the land trust discovered by Mr. Ottenheimer when he performed his title search on the Berkely property. Robert Sr. and Mr. Hussey also owned a second property in Palatine, Illinois ("the Palatine property").

17. Later, when Robert Jr. expressed interest in living in the Berkely property, Robert Sr. approached Mr. Hussey with a plan for a sort of property swap. The first part of the plan would result in Mr. Hussey taking the Palatine property in his name alone, while Robert Sr. would take the Berkely property alone. Robert Jr. would then trade his partnership interest in the Wheeling property for a partnership interest in the Berkely property. The final result for Robert Sr. was that he would own the Wheeling property alone and the Berkely property in partnership with his son.

18. Unfortunately, none of these transactions were recorded. Robert Sr. gave two reasons for this. First, he said he and Mr. Hussey trusted each other and could get around to formalities when they had time. Second, he said that the transactions with Robert Jr. were family matters which did not need to be recorded. As to this second aspect, there was also undisputed testimony at trial that Robert Sr. controlled the family finances and that this control included Robert Jr.'s finances to the extent that Robert Sr. even testified that "[Robert Jr.] doesn't question anything I did. I'm his father."

19. As of the bankruptcy trial, Robert Jr. continues to live in the Berkely property. He pays no rent, mortgage, or upkeep on the property. Sarah rents a residence in Roselle, Illinois, for herself and the two boys.

20. In the two years since entry of the judgment for dissolution of marriage in the circuit court, Robert has not paid Sarah any of the $75,000 awarded to her by the divorce judgment.

### Jurisdiction

Jurisdiction lies under 28 U.S.C §§ 1334 and 157. Venue is proper under 28 U.S.C. § 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

### Discussion

**A. The § 523(a)(2)(A) Count.**

▮▮▮ Determination of this count depends on analysis of § 523(a)(2)(A) of the Bankruptcy Code, the pertinent part of which reads as follows:

(a) A discharge under § 727 . . . of this title does not discharge an individual debtor from any debt

(2) for money . . . to the extent obtained, by

(A) false pretenses, a false representation, or actual fraud. . . .

Specifically, Sarah's complaint charges Robert with deception through false pretenses. What constitutes "false pretenses" in the context of § 523(a)(2)(A) has been defined as:

[A] series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor. . . . A false pretense is usually . . . the product of multiple events, acts, or representations

undertaken by a debtor which purposely create a contrived and misleading understanding of a transaction that, in turn, wrongfully induces the creditor to extend credit to the debtor. A "false pretense" is established or fostered willfully, knowingly and by design; it is not the result of inadvertence.

*In re Paneras*, 195 B.R. 395, 406 (Bankr. N.D.Ill.1996) (quoting *In re Dunston*, 117 B.R. 632 (Bankr.D.Colo.1990), *aff'd in part, rev'd in part*, 146 B.R. 269 (D.Colo. 1992)). Additionally, "silence or concealment as to a material fact can constitute false pretenses." *In re Overall*, 248 B.R. 146, 150 (Bankr.W.D.Mo.2000).

▮▮▮▮ The primary purpose of the bankruptcy laws is to provide a fresh start to "an honest but unfortunate debtor." *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934). As Robert notes, furtherance of this purpose requires that exceptions to discharge be liberally construed in favor of a debtor. *In re Paneras*, at 400. However, a second significant purpose of the bankruptcy laws is to prevent discharge of liabilities that would not exist if the debtor had not perpetrated a fraud. *Greenberg v. Schools*, 21 B.R. 1011, 1013 (S.D.Fl.1982). In filing for bankruptcy and seeking discharge of his liabilities, a debtor "place[s] the rectitude of his prior dealings squarely in issue." *Brown v. Felsen*, 442 U.S. 127, 128, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979).

▮▮▮▮ The test for false pretenses has three elements. First, the complaining creditor must show that the debtor obtained money from him by making representations which the debtor either knew to be false or which he made with such reckless disregard for the truth as to constitute willful misrepresentation. *In re Ferguson*, 222 B.R. 576, 584 (Bankr.N.D.Ill.1998). Next, the creditor must show that the debtor acted with intent to deceive. *Id.*

Finally, the creditor must prove that he justifiably relied on the debtor's statements. *Id.* For a creditor to win on this count, he must establish the three elements by a preponderance of evidence. *Grogan v. Garner*, 498 U.S. 279, 285, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

▮▮▮▮ Sarah has clearly made the necessary showing under § 523(a)(2)(A). As stated earlier, Robert began telling Sarah, even prior to their marriage, that he was saving money for a house down payment. While his intention at the outset may have been to purchase the Berkely property, and while he may have even saved some money to that effect, by the time Robert and Sarah moved into the house and he told her that the house was theirs, his knowledge of the truth, and his misrepresentations of it to Sarah were clearly discernible. He knew at that time that he had not made a down payment on the house. In fact, he knew that title to the house was actually held in a land trust owned by his parents and their friends.

Once settled into the home, Robert continued to collect Sarah's paychecks, telling her that he needed them to pay the mortgage. Again, Robert was perfectly aware of the falsity of this statement. In his proposed conclusions of law, Robert states that "at the time the debtor made any representations as to ownership of the property, the debtor did not know that they were false because at the time that they were made he owned a partnership interest in the property." It is true that Robert did at one point have a partnership interest in the property. This point itself, however, is irrelevant. Sarah is not claiming that Robert deceived her as to the partnership, or any interest he had in it. Rather, Sarah claims Robert told her that they, as a couple, owned the house and had a mortgage on it. When he and Sarah moved into the house, Robert knew that he

had $8000 in the capital account that formed the basis of the Fosco Partnership. He knew that his father was deducting monthly sums from this account. He knew that these sums were serving as rental payments on the house. Once the capital account was depleted, Robert knew that he and Sarah were living in the house rent free. In spite of his knowledge of the true status of ownership of the house, Robert never informed Sarah. Instead, he continued to represent to her that he needed her checks to pay the mortgage when he knew that there was not and there had never been a mortgage. In short, to Sarah's charge "You told me we had a mortgage," Robert cannot defend with "Well, I was a partner."

As for the scienter element of a section 523(a)(2)(A) claim, an intent to deceive may logically be inferred from a false representation which the debtor knows or should know will induce another to advance money to him. *In re Kimzey*, 761 F.2d 421, 424 (7th Cir.1985) *abrogated as to other issues by Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Moreover, proof of fraud may be presented in the form of direct or circumstantial evidence, "since palpable evidence of the mental state of an individual is rarely, if ever, available." *In re Overall*, at 150. Sarah testified at trial that she and Robert decided to live with Sarah's parents while they were waiting for the lease on the Berkely property to expire and for those tenants to move out. They made this decision in order to save money for the house down payment and Sarah's parents agreed to the arrangement. Later, when the couple moved into the house, both of them held out to others that they owned the house. Sarah's father corroborated this testimony. He testified that he and his friends made substantial improvements to the house because he believed his daughter and son-in-law owned the house.

He testified that he never would have invested the time or money had he known the couple were merely tenants. Sarah testified that it was not until the week she left him that Robert told her that he never had any intention of ever putting her name on the house. Robert, on the other hand, denies that he ever asked Sarah for money towards the house, and denies that she ever gave him any. He claims that he was not "for sure" that he would never get title to the house, though he does admit that he never paid a penny for rent, mortgage, or upkeep, and that he still pays absolutely nothing. He claims that he did not intend to deceive Sarah. He claims this is proved because his loss of an ownership interest in the property resulted from his and Sarah's inability to generate enough income to pay rent.

It is well-settled that a court, when sitting without a jury, may take into account a witness' interest in the outcome of the case, his intentions, his seeming honesty, and his conduct on the witness stand. *Welch v. Tennessee Valley Authority*, 108 F.2d 95, 101 (6th Cir.1939). "[T]he carriage, behavior, bearing, manner, and appearance of a witness-in short, his demeanor-is a part of the evidence." *Dyer v. MacDougall*, 201 F.2d 265, 268 (2nd Cir. 1952). It is by no means necessary for me to rely solely on the words used by a witness when making up my mind about the truth of the matter the witness testifies to. *Id.* at 269. Within the bounds of reason, I am at liberty to reject the testimony of a witness that does not produce conviction in my mind about its truthfulness. *Joseph v. Donover Co.*, 261 F.2d 812, 824 (9th Cir.1958). On the other hand, of course, I am not at liberty to arbitrarily reject uncontroverted evidence. *Id.*

At trial, I had ample opportunity to observe the demeanor and attitudes of

both witnesses. Since then, I have carefully reviewed the exhibits, transcripts, and my own trial notes. After careful reflection, I have determined that Sarah's testimony is credible, as is her father's. Robert's testimony is simply not. While Robert's statement that he lost his interest in the house because the couple failed to pay rent may in fact be true, it does nothing to explain why he told Sarah they owned the house. Nor does it explain why he continually took money from her when he was not paying any of it toward housing expenses. In short, Robert's actions toward and statements to Sarah lead to the inescapable conclusion that he intended to deceive her.

The final element of the test is reliance on the false pretense. Reliance under section 523(a)(2)(A) must be "justifiable." *Field v. Mans*, 516 U.S. 59, 74–75, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Justifiable reliance is a lesser standard than a reasonable reliance standard. *In re Scarpello*, 272 B.R. 691 (Bkrtcy.N.D.Ill.2002). The justifiable reliance standard imposes no duty to investigate unless the falsity of the representation is readily apparent. *Id.* The circumstances of each case will determine whether an investigation was warranted, and the subjective qualities of the creditor will be considered. *Field v. Mans*, at 77, 116 S.Ct. 437.

Considering all the circumstances and Sarah's lack of familiarity with complex business transactions, I find Sarah's reliance on her husband to be justifiable. To begin, he was her husband and inherent in the marital relationship is supposed to be, at minimum, a basic level of trust. On top of that, they had planned to live with her parents, save money, then together buy the house from Robert's father. She contributed her funds to that plan and when the couple moved into the home, Robert told her it was theirs. Sarah did not graduate from high school, had never even signed a lease before, and certainly had no experience with real estate transactions. Given that the transaction was supposed to have been consummated with Robert's father, Sarah would have had no reason to be suspicious when no formal closing occurred. After the couple moved in, it would have been reasonable for Sarah to assume that the money she continued to give Robert was going to the mortgage payment. All told, I find Sarah's reliance justifiable under the circumstances of this case.

Based on the foregoing, I find that Robert obtained funds from Sarah through false pretenses. Therefore, the debt is nondischargeable under Count I.

## B. The § 523(a)(5) Count.

Section 523(a)(5) of the Bankruptcy Code provides in part:

(a) A discharge under § 727 ... of this title does not discharge an individual debtor from any debt ...

(5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with State or territorial law by a governmental unit, or property settlement agreement. . . .

Sarah contends that the $75,000 obligation is in the nature of child and spousal support. She argues that the divorce court intended the money to be used to provide daily necessities for herself and the children, given the limited amount of marital assets available for distribution to the divorcing parties.

Robert, on the other hand, contends that the $75,000 debt he owes to Sarah under the divorce judgment is dischargeable be-

cause the Bankruptcy Code allows obligations arising from the division of marital property to be discharged. *In re Brodsky,* 239 B.R. 365, 370 (Bankr.N.D.Ill.1999). Because the divorce judgment categorized the house under the heading "Marital Assets and Debts," and because there is a separate heading in the divorce judgment entitled "Maintenance," Robert believes the allocation of equity in the house should be deemed a division of marital property. Additionally, Robert argues that the divorce judgment contains a separate waiver of maintenance under the heading "Mutual Bars," and thus the $75,000 cannot be deemed support.

 Section 523(a)(5) of the Code contains three requirements that must be met before a marital debt becomes nondischargeable in bankruptcy: (1) the debt must be in the nature of alimony, maintenance, or support; (2) it must be owed to a former spouse or child; and (3) it must be in connection with a separation agreement, divorce judgment, or property settlement agreement. *In re Reines,* 142 F.3d 970, 972 (7th Cir.1998). As is frequently the case, only the first requirement is in dispute here. I must decide whether Robert's debt to Sarah is in the nature of support or whether it is part of a property division between the spouses.

 Whether the debt is non-dischargeable maintenance is a matter of federal bankruptcy law, not state law. *Reines,* 142 F.3d at 972. Exceptions to discharge are construed strictly against a creditor, and the party attempting to establish an exception to discharge bears the burden of proof. *Id.* at 973. In this case, Sarah must establish the facts necessary to support her claim.

 Notably, however, I am not bound by the labels utilized by the state court in the divorce judgment. *Id.* at 972. When a state court judge formulates a divorce judgment, one of the judge's primary goals is to ensure that any children of the marriage will be adequately provided for. It is important, but secondary, to ensure an equitable distribution of marital assets and debts between the divorcing spouses. Rarely will the state judge design a divorce judgment in anticipation of one of the parties filing bankruptcy. *In re Harr,* 2000 WL 1341402 (Bankr.N.D.Ill.).

 To properly dispose of the dischargeability issue then, I must determine the substance of the obligation, while looking to the state court proceeding and judgment for whatever relevant insight they may offer. *In re LeRoy,* 251 B.R. 490, 502 (Bankr.N.D.Ill.2000). Numerous courts have propounded lengthy lists of factors to be weighed in resolving this matter. No special combination of any of the lists provides a magic formula. The Seventh Circuit has commented that "the end result of an exercise of this sort is usually a mixed bag with factors pointing in both directions." *Reines,* 142 F.3d at 973. I sit here now holding such a bag.

 In my view, some of the more significant factors include: 1) the language and substance of the divorce judgment in the context of surrounding circumstances; 2) the function served by the obligation; 3) the relative incomes and financial circumstances of the parties; 4) the nature and duration of the payments; 5) the comparative ages, employability and educational levels of the parties; 6) waivers of maintenance, and 7) other factors bearing on the spouse's need for support at the time the order was entered, *Hansel v. Hansel,* 1992 WL 280799 (N.D.Ill.), including whether there are children of the marriage who require support. *In re LeRoy,* at 503. Notwithstanding this list, however, the critical inquiry is ultimately whether the intent of the divorce court and the parties

was to provide support or to divide marital property. *Id.* at 503. In order to find that the debt qualifies as support, Sarah must show that at the time of entry of the divorce judgment, the payment of the debt was essential to maintain the necessities of life, such as food, housing, clothing, and transportation. *Hansel,* at *4; *Yeates v. Yeates,* 807 F.2d 874, 879 (10th Cir.1986).

At the end of the bankruptcy trial, the parties agreed to submit written proposed findings of fact and conclusions of law in lieu of oral closing arguments. Robert's proposed findings rely primarily on factors one, three, four, and six above. Sarah looks more to factors, one, two, five, and seven.

As to factors one and six, Robert relies heavily on the language of the divorce judgment. He notes that the $75,000 payment was placed under the "Marital Assets & Debts" heading. The judgment also contained a "Maintenance" heading and a "Mutual Bars" heading. Each of these headings contained a waiver of maintenance provision. As to factor four, the nature and duration of payments, Robert argues that the divorce judgment awarded Sarah a lump sum payment rather than payments spread over time. Lump sums, he asserts, are standard in property divisions, while periodic payments are more the norm in support arrangements. Robert also argues that the lump sum payment was not terminable upon his death. Such non-terminable payments are often found to be in the nature of property settlements, while payments that end upon the payor's death are typically found to be in the nature of support. Taken together, it is true that this combination of factors tends to point in the direction of a finding that the debt is in the nature of a property division.

On the other hand, from Sarah's perspective of factors one, five, and seven,

"the evolution of domestic relations law has made it increasingly difficult to distinguish between support and property division." *Buccino v. Buccino,* 397 Pa.Super. 241, 580 A.2d 13, 18–19 (1990). Many courts have observed that "even an obligation designated as a property settlement may be related to support because state courts often will adjust alimony awards depending on the nature and amount of marital assets available for distribution." *In re Adams,* 200 B.R. 630, 633 (N.D.Ill. 1996); *In re Gianakas,* 917 F.2d 759, 763 (3rd Cir.1990); *Buccino,* at 18. In this case, I have no transcript of the trial that formed the basis for the state court decision. I have only the judgment itself to consider. It is true that the judgment includes no express provision for Sarah's support. In fact, she expressly waived her right to maintenance. Yet, given the circumstances, the facts strongly indicate that support payments were necessary.

To begin with, the two minor children remained in Sarah's custody, and her ability to support them was limited. She possessed only an eleventh-grade education. She was employed full-time in the bakery at Dominick's, but possessed no special job-related skills. At trial, Sarah testified that at the time of the divorce her net income was $1593.84 per month from her job at Dominick's, while her monthly expenses were $3564.00. She was making less than $14.00 per hour, while her rent payment was $905 per month for herself and the two boys. Although Robert was supposed to be paying $350 per month in child support, at the time of the divorce trial, he was at least $1841.00 in arrears. Even had he been current, $350 per month would hardly have made a dent in Sarah's income/expenses equation.

Analysis of factor two, which deals with the function to be served by the obligation, reveals another aspect of the divorce judg-

ment that mitigates Sarah's waiver of maintenance and favors a finding of support. The evidence clearly shows that the parties had accumulated very little wealth during the marriage. The divorce judgment equally divided IRA accounts totaling $42,876. It awarded Robert a 1998 Buick Century, and Sarah a 1988 Ford Tempo. The only other marital assets were the house and two custodial bank accounts set up for the children. Thus, since Robert was given the right to remain in the home, Sarah faced the prospect of establishing a new household with $21,438 (possibly considerably reduced by an IRS penalty for early withdrawal from an IRA), and a twelve-year-old car.

Finally, and perhaps most significantly, the circuit court judge certainly had the opportunity during the divorce proceedings, as did I during the bankruptcy trial, to deduce that Robert has a miserable track record as bread-winner for a family of four. On top of being one of the least believable witnesses I have ever encountered in sixteen years as a judge, Robert has compiled the record of an irresponsible slacker. As to factor three above, Robert argues that support awards are regularly used to balance income between the parties. He unwisely reminds me that Sarah, who has an eleventh-grade education, who provides for two young boys, and who works full-time, makes more money than he does. Because she makes more money than he does, his argument goes, the $75,000 award to Sarah is not intended to balance income, and therefore cannot be in the nature of support. In fact, Robert argues, that because he knew she would be raising the children, *he* agreed to waive his right to maintenance from *her,* even though he would have preferred to finish his education. Unfortunately for Robert, this preposterous argument is soundly refuted. From my review of the following evidence presented at trial, it is clear to me that it is Robert's unwillingness to remain gainfully employed, rather than any lack of ability on his part, that results in Sarah continually earning more money than Robert. Furthermore, based upon my experience presiding over divorce actions, I can readily liken Robert's conduct to that of many a deadbeat dad, who would choose not to work at all, or work well below potential, rather than choose to help support his children and ex-wife. Moreover, it appears likely to me that Robert Sr. is a willing accomplice in Robert Jr.'s deplorable deportment.

By his own account, Robert has lived in the Berkley house since June of 1992 and has never paid a penny for rent. Nor has he paid toward a mortgage on the property, or for expenses, or for upkeep. Evidence presented at trial indicates that Robert's idyllic living arrangement results from a combination of two factors.

First, it appears that Robert has never been especially motivated to hold a steady job. Robert worked, on and off, for his father from 1983–1995 as a sales clerk in a men's clothing store. When his father closed the store, Robert collected unemployment for a time. Then Robert worked for four different businesses in 1996, earning a total of $2704.30 in that year, but holding none of those positions for longer than three months. In 1997, Robert worked for two companies earning $17,778.10. According to his answers to interrogatories, Robert changed jobs again in 1998, and was earning $1000 per pay period at the time he answered the interrogatories. Sometime after answering the interrogatories, Robert made another job change and started working part-time for both the YMCA and a company called Huffey Service First with his combined yearly income totaling about $14,500. At the time of trial, Robert was working sole-

ly at the YMCA where he is currently earning $20,000 per year.

The second apparent reason Robert has never assumed full responsibility for his own affairs is because his father, Robert Sr., has always propped him up financially. Robert Sr. was deposed in July of 1999, prior to the divorce trial. The deposition was introduced as evidence at the bankruptcy trial. The following is an excerpt from that deposition dealing with Robert Sr.'s financial support of his son:

Q: Have you ever discussed your son's work or non-work with him?

A: I don't see my son very often.

Q: You just pay his-you just let him live in a house and pay the expenses for him; is that correct?

A: At a minimum.

Q: Do you ever inquire to him as to why or when he's going to pay your expenses for the house?

A: We've discussed it when he gets established in a better job he would pay.

Q: What's established in a better job, what does that mean?

A: That he should establish himself and make some money and be able to pay his bills.

Q: And what does he say when you discuss that he should establish himself in a better job?

A: That the turmoil of this divorce has ruined his applicable intelligence. And that as soon as–

Q: It's ruined his what?

A: His ability to apply himself. And as soon as it's over, he'll straighten things out.

Q: Are you concerned about who's supporting your grandchildren?

A: Who's supporting my grandchildren? Oh, I'm sure the Kings will help.

Q: I'm asking you, are you concerned who's supporting them?

A: Well, since I advanced them the money to bring her up-to-date three weeks ago, I suppose I was concerned.

Q: Do you discuss with your son that he should be supporting his children?

A: To support your children, you need an income.

Q: Is your son paying health insurance for your grandchildren?

A: I have no idea.

Q: Do you know what your son is paying to support the grandchildren?

A: I think $75.00 a week.

Q: If the children were to live with your son, he couldn't support them, could he?

A: Oh, I'd see that they didn't starve.

This testimony continues in the same vein for some time. Robert Sr. also testifies that he paid $950.32 toward Robert's child support arrears, paid Robert's legal fees, gave him pocket money, loaned him money to buy a car, and paid for some of his college courses. Robert Sr. further remarked that he knew of no reason why Robert Jr. couldn't hold down a full-time job and that Robert Jr. probably is employable.

More than three years later, at the bankruptcy trial, Robert Sr. testified again, and it appears from his testimony that nothing about Robert Jr.'s financial situation has changed. The following is a brief excerpt from Robert Sr.'s trial testimony:

Q: Does he [your son] currently occupy the property now? Does he currently occupy 590 W. Berkely now?

A: He does.

Q: Does he pay rent?

A: Not at all.

Q: Why not?

A: He doesn't have the means for one thing. . . .

Q: Why are you not asking for rent from your son for the property?

A: I have asked, and he is unable to pay.

In short, an award to Sarah of regular support payments from Robert would have been tantamount to an award of a lifetime of court battles, frustration, and futility. I find that the facts of this case amply support Sarah's contention that the $75,000 awarded to her by the circuit court was in the nature of an award of support for her and the children. Accordingly, I hold pursuant to section 523(a)(5) that Robert's indebtedness to Sarah is nondischargeable.

### C. The § 727(a)(4) Count & Collateral Estoppel.

Sarah's complaint alleges that Robert knowingly and fraudulently failed to disclose his interest in 590 W. Berkely on his bankruptcy schedules. She alleges this failure constitutes a false oath which should result in denial of discharge. She also alleges under this count that Robert is collaterally estopped from relitigating the issue of ownership which was determined in a final order by the circuit court.

Although it appears to me that the false oath issue and the collateral estoppel issue are separate and should not have been argued together, the resulting analysis of each leads to findings for Robert.

**(1) Code § 727(a)(4).** When Attorney Ottenheimer originally filed schedules for Robert, he was aware of the state court divorce judgment declaring the Berkely property marital property. As noted previously, to verify Robert's interest in the property, Mr. Ottenheimer performed a title search. The search indicated that Robert had no legal interest in the property. This led Mr. Ottenheimer to conclude that the property was not part of the bankruptcy estate because Robert could in no way encumber or transfer the property. Based on these conclusions, Mr. Ottenheimer advised Robert not to list any real property interests on Schedule A.

Later, after speaking to the trustee at the meeting of creditors held pursuant to section 341 of the Bankruptcy code, Mr. Ottenheimer advised Robert that Schedule A should be amended to reflect the wording of the divorce judgment. Robert agreed to amend the schedule despite the fact that both he and Mr. Ottenheimer believed Robert's interest in the property was merely that of a tenant.

■ Section 727(a)(4) requires complete financial disclosure as a condition of discharge. *In re Ardisson,* 272 B.R. 346, 359 (Bankr.N.D.Ill.2001). This is to ensure that Debtors provide accurate financial information to those who have an interest in the administration of the bankruptcy estate. *In re Mukhi,* 254 B.R. 722, 728 (Bankr.N.D.Ill.2000). Signing the schedules constitutes an oath attesting to the accuracy of the schedules, and an error in the schedules can be basis for denial of discharge. *Id.*

■ In order to prevail on her section 727(a)(4) claim, Sarah must establish five elements: 1) Robert made a statement under oath; 2) the statement was false; 3) Robert knew the statement was false; 4) the statement was made with intent to deceive; and 5) the statement was materially related to the bankruptcy. *Ardisson* at 359. Sarah has only proved elements one and five. Robert signed both the original and the amended Schedule A, thereby making an oath. Additionally, a statement with respect to ownership of real property on a bankruptcy schedule is materially related to the issue of what assets comprise the bankruptcy estate. Sarah's proof on the remaining three elements is less con-

vincing. Whether the failure to disclose the real estate interest was an omission which amounts to a falsity and whether the omission was intended to deceive creditors are both open to question. Nevertheless, given Attorney Ottenheimer's original advice, and the nature of Robert's interest in the Berkely property, I can not conclude that Robert knew the omission was a false statement.

Though Sarah contends that Robert told her the house was theirs and that they had a mortgage on it, she could produce no contract, no deed, no recordings, no note, no mortgage, nor any other legal proof of ownership of the home. Given the dearth of preserved factual findings in the divorce proceedings concerning the Berkely property, it is difficult to determine the precise status of ownership of that property at this present time. What appears to have happened, and what I will conclude, is that the state court judge, by implication, imposed a constructive trust for the benefit of Sarah on the Berkely property. Since this finding was not spelled out in the divorce judgment, and the actual language used in the divorce judgment was not crystal clear, I cannot find that Robert knowingly made a false oath with intent to deceive the court or any other party in interest, when he filed Schedule A of his bankruptcy schedules.

■■■■ **(2) Collateral Estoppel.** Sarah believes that Robert should be estopped from discharging the debt owed to her because the state court entered judgment in her favor. There are three requirements to be met for collateral estoppel to apply under Illinois law: 1) the issue to be precluded must be the same as that involved in the prior action; 2) there must be a final judgment on the merits; and 3) the party to be estopped in the current action must be the same party as in the prior action. *In re Mukhi*, 254 B.R. 722,

728 (Bankr.N.D.Ill.2000) citing *Kalush v. Deluxe Corp.*, 171 F.3d 489, 492 (7th Cir. 1999). Federal courts must give full faith and credit to state court judgments under 28 U.S.C. § 1738.

■■■ While it is true that Sarah received an award of $75,000 from Robert via the judgment for dissolution of marriage, the issues adjudicated in the state court proceeding were not the same as those presented in the complaint for dischargeability of that debt in bankruptcy. The state court never resolved any question of false oaths, fraud, misrepresentation, or any other dischargeability issue. Rather, the issues determined in state court were purely divorce issues; i.e. child support, property division, maintenance, etc. Therefore, the issues decided in state court are not the same as the issues to be decided in this court, and collateral estoppel does not apply. *Mukhi*, at 727.

### Conclusion

Robert J. Fosco's debt of $75,000 to Sarah Fosco is nondischargeable in bankruptcy under § 523(a)(2)(A) and § 523(a)(5) of the Bankruptcy Code. Sarah has not proved the count brought under section 727(a)(4) and the principle of collateral estoppel. Accordingly, judgment will be entered by separate document in favor of Sarah Fosco on Counts I and II of the complaint, and in favor of Robert Fosco on Count IV.

The Clerk is requested to send copies of this decision and the judgment to counsel of record.